# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 08-61473-CIV-GRAHAM

MID-CONTINENT CASUALTY COMPANY,

      Plaintiff,

vs.

GUITREE BASDEO, SOUTHGATE GARDENS
CONDOMINIUM ASSOCIATION, INC., and
FIRST STATE DEVELOPMENT
CORPORATION,

      Defendants,

and

SOUTHGATE GARDENS CONDOMINIUM
ASSOCIATION, INC.,

      Counter-Claimant,

vs.

MID-CONTINENT CASUALTY COMPANY,

      Counter-Defendant.
_____/

## REPORT AND RECOMMENDATION

These matters are before the Court upon an Order of Referral [D.E. 243] from district judge

concerning Defendant/Counter-Claimant Southgate Gardens Condominium Association, Inc.'s

Motion for Summary Judgment on the Amended Complaint [D.E. 107], Defendant Guitree Basdeo's

Motion for Summary Judgment on the Amended Complaint and on the Counter-Claim [D.E. 106],

and Plaintiff Mid-Continent Casualty Company 's Motions for Summary Judgment on Counts I and

1

II of the Amended Complaint and on its Affirmative Defenses to the Counter-Claim.  [D.E. 111, D.E. 112], Defendant Basdeo's Motion to Amend Her Motion for Summary Judgment [D.E. 115]; Defendants' Motion to Strike Affidavit and Errata Sheet of Keith Nye [D.E. 208], Defendant Southgate's Motion to Join Basdeo's Motion for Summary Judgment [D.E. 147], and Defendant Basdeo's Motion to Join Southgate's Motion for Summary Judgment [D.E. 142].  The Court held a hearing on August 17, 2001, where the parties presented argument.

Upon careful consideration of the record in this matter and oral argument, and being otherwise duly advised in the premises, I recommend that Mid-Continent's Motion for Summary Judgment on Counts I and II [D.E. 112] be **DENIED**; that Mid-Continent's Motion for Summary Judgment on Its Affirmative Defenses [D.E. 111] be **DENIED** with respect to its Sixth, Seventh, Fifteenth, Seventeenth, and Twentieth Affirmative Defenses and be **DENIED AS MOOT** with regard to its Ninth Affirmative Defense; that Defendant Southgate's Motion for Summary Judgment [D.E. 107] be **GRANTED** as it relates to Counts I and II of Mid-Continent's Amended Complaint, **DENIED** as it relates to Counts III and IV of Mid-Continent's Amended Complaint, and **DENIED AS MOOT** as it relates to Count V of Mid-Continent's Amended Complaint, and be **DENIED** and as it relates to its Counter-Claim and its affirmative defenses set forth in paragraphs 44 and 47 of Southgate's Answer; and that Defendant Basdeo's Motion for Summary Judgment [D.E. 106] be **GRANTED** as it relates to Counts I and II of Mid-Continent's Amended Complaint, **DENIED** as it relates to Counts III and IV of Mid-Continent's Amended Complaint, and **DENIED AS MOOT** as it relates to Count V of Mid-Continent's Amended Complaint.

### *I. Background*

In 2005 Hurricane Wilma inflicted significant damage on the buildings and units located at

Defendant/Counter-Claimant Southgate Gardens Condominium Association, Inc. ("Southgate"). To repair the damage to the buildings and units, Southgate hired building contractor First State Development Corporation ("First State").

Following numerous problems with First State's performance and substantial alleged damage resulting from First State's activities, Southgate fired First State in 2006. Subsequently, in 2007, Southgate and Defendant Guitree Basdeo ("Basdeo"),[1] an individual unit owner at Southgate, filed separate complaints in Florida state court against First State asserting, among other allegations, breach of contract, negligence, and conversion. When First State failed to appear or file a notice in the state cases, after motions by Southgate and Basdeo, the state court entered default judgments regarding liability (but not damages) against First State.

Because First State had an insurance policy with Plaintiff/Counter-Defendant Mid-Continental Casualty Company ("Mid-Continent" or "Plaintiff") during First State's services to Southgate, Mid-Continent filed this lawsuit for declaratory relief seeking an order announcing that Mid-Continent owed no duty to defend or indemnify First State from the state court judgments and alternatively limiting coverage under the insurance policy at issue. Subsequently, Defendant Southgate filed a Counter-Claim seeking a declaratory judgment finding, essentially, the opposite.

## II.  Preliminary Matters

Before addressing the parties' Motions for Summary Judgment, the Court pauses to announce its rulings on the various other pending motions relating to the Motions for Summary Judgment. Because these matters relate to the Motions for Summary Judgment, the Court addresses them in this Report and Recommendation, even though pursuant to the Order of Referral, the Court issues its

---

[1]The Court refers to Defendants Southgate and Basdeo collectively as "Defendants."

3

actual orders on these motions separately.

**A.      Defendant Basdeo's Motion to Amend Her Motion for Summary Judgment [D.E. 115]**

Defendant Basdeo filed her Motion for Summary Judgment. [D.E. 106]. Later the same day, Defendant Basdeo filed a Motion to Amend the Motion for Summary Judgment [D.E. 115] and attached exhibits to the Motion. Both the original Motion for Summary Judgment and the Motion to Amend appear to be the same in all respects except that the Motion to Amend attaches exhibits. No party has objected to Basdeo's Motion to Amend, and the Motion to Amend was timely filed. In view of these facts, by separate Order, the Court **GRANTS** Basdeo's Motion to Amend the Motion for Summary Judgment. Thus, the Court considers Basdeo's Motion for Summary Judgment as filed at D.E. 115.

**B.      Defendant Southgate's Motion to Join in Defendant Basdeo's Motion for Summary Judgment [D.E. 128] and Defendant Basdeo's Unopposed Motion to Join in Defendant Southgate's Motion for Summary Judgment [D.E. 142]**

Defendant Southgate filed its Notice of and Motion to Join in Defendant Basdeo's Motion for Summary Judgment [D.E. 128]. In its Notice and Motion, Defendant Southgate represented that Defendant Basdeo consented to Southgate's Motion, but Plaintiff opposed the Motion. *See id.* Subsequently, Plaintiff notified the Court that it had no objection to Defendant Southgate's Motion. *See* D.E. 147. In addition, Defendant Basdeo filed her Notice of and Motion to Join in Defendant Southgate's Motion for Summary Judgment, and stated that both Defendant Southgate and Plaintiff consented to Basdeo's Motion. *See* D.E. 142.

Upon review of the filings and in view of the lack of objection to each Defendant's separate Motion, by separate Order, the Court **GRANTS** both Defendant Southgate's Notice of and Motion to Join in Defendant Basdeo's Motion for Summary Judgment [D.E. 128] and Defendant Basdeo's Unopposed Notice of and Motion to Join in Defendant Southgate's Motion for Summary Judgment

4

[D.E. 142].

**C.      Compliance with Local Rule 7.5, S. D. Fla.**

In Mid-Continent's Response to Basdeo's Statement of Facts, Mid-Continent argues that Basdeo failed to file a statement of undisputed material facts in support of her Motion for Summary Judgment [D.E. 115] in accordance with Local Rule 7.5(c), S.D. Fla., and requests that the Court deny Basdeo's Motion for Summary Judgment on this basis alone. *See* D.E. 167 at 1. Alternatively, Mid-Continent parsed out into separately numbered paragraphs what it viewed as each material fact of the proposed facts that Basdeo set forth in her Motion for Summary Judgment, and attached it to its filing as "Exhibit A." *See* D.E. 167 at 1; Exhibit A, D.E. 167-1 at 1-7. Thereafter, Mid-Continent provided a specific response to each of the separately numbered paragraphs of facts it set forth in Exhibit A. D.E. 167 at 2-8.

Local Rule 7.5, S.D. Fla., requires, in relevant part, as follows:

> (a)      **Motions for Summary Judgment**. Motions for summary judgment shall be accompanied by a memorandum of law, necessary affidavits, and a concise statement of materials facts as to which the movant contends there exists no genuine issue to be tried.
>
> . . . .
>
> (c)      **Statement of Material Facts**.  The statement of material facts submitted . . . in support of . . . a motion for summary judgment shall:
>
> > (1)      Not exceed ten (10) pages in length;
> >
> > (2)      Be supported by specific references to pleadings, depositions, answers to interrogatories, admissions, and affidavits on file with the Court; and
> >
> > (3)      Consist of separately numbered paragraphs.

. . . .

S.D. Fla. L.R. 7.5.  Upon review of Defendant Basdeo's Motion for Summary Judgment and Basdeo's submissions in the docket, the Court agrees that Defendant Basdeo did not meet the requirements of Local Rule 7.5, S.D. Fla.  First, Basdeo has identified nothing that she has filed in support of her Motion for Summary Judgment as a statement of undisputed material facts.  Second, while Basdeo did set forth a section entitled "Factual Background" in her Motion for Summary Judgment [*see* D.E. 115 at 1-6], this section fails to separate facts into individually numbered paragraphs and does not contain specific references to the record to support each and every one of the facts alleged.

The Court enjoys discretion to strike Basdeo's Motion for this reason alone.  Nevertheless, Co-defendant Southgate's Motion for Summary Judgment does comply with the Local Rules, and Defendants have joined each other's Motions for Summary Judgment.  Moreover, the two Motions are substantially similar.  Thus, the Court would consider Southgate's Motion even if it were to decline to address Basdeo's Motion.  Under these particular circumstances, while the Court does not condone violations of the Local Rules, the Court finds that the best use of its resources weighs against striking Basdeo's Motion for violation of this particular Local Rule.

Instead, the Court considers Basdeo's Motion and "Factual Background" to the extent that Basdeo, Southgate, or Mid-Continent has identified support in the record for the contentions contained therein.  Should Basdeo have failed to cite record support for any fact and should neither of the other parties have otherwise set forth support for a factual proposition, however, under Local Rule 7.5(c), the Court will not consider the proposed fact.  For ease of discussion and in the absence of any objection by Basdeo to Mid-Continent's rendition of Basdeo's contentions of undisputed material facts set forth in Exhibit A to Mid-Continent's Response to Basdeo's Statement of Facts

6

in her Reply [*see* D.E. 197, 205], the Court refers in this Report and Recommendation to the separately numbered paragraphs of facts articulated in Exhibit A as though it were Basdeo's Statement of Undisputed Facts [D.E. 167-1].

Along the same lines, while no party has brought this matter up, Local Rule 7.5(b), S.D. Fla., requires of parties opposing a motion for summary judgment that they submit a "single concise statement of material facts as to which it is contended that there exists a genuine issue to be tried," and Local Rule 7.5(c) specifies that such statement must be "supported by specific references to pleadings, depositions, answers to interrogatories, admissions, and affidavits on file with the Court." Furthermore, where the Court finds that the movant's statement of facts is supported by the evidence in the record, "[a]ll material facts set forth in the movant's statement . . . will be deemed admitted unless controverted by the opposing party's statement. . . ."  L.R. 7.5(d), S.D. Fla.

Upon review of Defendant Basdeo's, Defendant Southgate's and Plaintiff's respective Oppositions to the opposing parties' statements of undisputed material facts, the Court notes that these Oppositions fail to provide evidentiary support for each and every fact offered in opposition to the facts set forth in the proponents' various material statements of undisputed fact.[2]  Thus, in accordance with Local Rule 7.5, where a party has failed to direct the Court to evidentiary support in the record for any proposed contravening material fact, the Court deems the corresponding proposed uncontroverted material fact admitted for purposes of the Motions for Summary Judgment,

---

[2]Local Rule 7.5 further specifies that "[s]tatements of material facts submitted in opposition to a motion for summary shall correspond in order and with the paragraph number scheme used by the movant. . . . Additional facts which the party opposing summary judgment contends are material shall be numbered and placed at the end of the opposing party's statement of material facts . . . ." L.R. 7.5(c), S.D. Fla. The Oppositions do not comply with this aspect of the Local Rules, either.

provided that the Court finds the statement of material fact at issue to be supported by the evidence.[3]

**D.**     **Defendants Southgate and Basdeo's Joint Motion to Strike [D.E. 208]**

In Defendants' Joint Motion to Strike, Defendants assert that an Affidavit by Keith Nye [*see* D.E. 114-17] filed in support of Plaintiff's Motion for Summary Judgment, and an errata sheet for Nye's deposition testimony [*see* D.E. 163], should be stricken.  D.E. 208.  The Court addresses each issue in turn.

### *1.  Affidavit of Keith Nye*

According to Defendants, Nye's original Affidavit was unsigned, and it was neither signed nor notarized by an authorized officer.  As a result, Defendants urge, Nye's Affidavit failed to comport with Rule 56(e), Fed. R. Civ. P.  While Defendants acknowledge that Plaintiff has now submitted an executed copy of the Affidavit [*see* D.E. 207-1], Defendants assert that they are still prejudiced because the Court could have decided the Motion on an unsigned affidavit, as originally submitted by Plaintiff.

Under Rule 56,  Fed. R. Civ. P., affidavits supporting or opposing summary judgment must be made on personal knowledge and must set forth facts that would constitute admissible evidence. *Macuba v. Deboer,* 193 F.3d 1316, 1323 (11th Cir. 1999); Fed. R. Civ. P. 56.  As a result, "[u]nsworn

---

[3]Other aspects of Mid-Continent's Motions for Summary Judgment likewise are not in strict compliance with the Local Rules.  In this regard, Mid-Continent simultaneously filed two separate Motions for Summary Judgment – one on Counts I and II of its Amended Complaint and one on its affirmative defenses to the Counter-Claim.  The Counter-Claim is basically a mirror image of the Amended Complaint in this case, seeking a declaratory judgment finding coverage, whereas the Amended Complaint requests a declaratory judgment finding no coverage.  Under these circumstances, Mid-Continent's practice of filing more than one summary judgment motion appears to violate Local Rule 7.1(c)(2), which expressly states, "The practice of filing multiple motions for partial summary judgment shall be prohibited, absent prior permission of the Court."  The docket sheet reflects no such Court authorization.  Moreover, when the pages from both of Mid-Continent's Motions for Summary Judgment are totaled, they exceed the 20-page limit established by Local Rule 7.1(c)(2).

statements . . . should not be 'consider[ed] in determining the propriety of summary judgment.'"[4]
*McCaskill v. Ray*, 279 F. App'x 913, 915 (11th Cir. 2008) (quoting *Gordon v. Watson,* 622 F.2d 120, 123 (5th Cir.1980)); *see also Beard v. Green*, 2010 WL 411084, *10 (S.D. Fla. Jan. 29, 2010) (striking unsworn statement in support of the opposition to motion for summary judgment); *Wallace v. City of Tarpon Springs,* 2007 WL 128839, *5 (M.D. Fla. Jan. 12, 2007) (same).

After review of the signed and notarized Nye Affidavit filed on January 13, 2010, the Court declines to grant Defendants' Motion to Strike the Affidavit.  Explaining that it had filed the unsigned version of the Nye Affidavit inadvertently, Plaintiff ultimately filed a properly executed Nye Affidavit that was signed and notarized on November 16, 2010, prior to the date of Plaintiff's original submission of its Motion for Summary Judgment on November 23, 2009.  To the extent that Defendants suggest that late production of the signed Affidavit prejudiced them because the Court could have decided their Motions on the unsigned version, the Court rejects this argument as moot because no decision had been issued as of the time of the filing of the signed version.

The Court finds that the Nye Affidavit as filed on January 13, 2010, properly meets standards set forth in Rule 56, Fed. R. Civ. P.  Thus, the Court substitutes the properly executed Nye affidavit at D.E. 207-1 for the deficient one at D.E. 114-17.  *See Hetrick v. Ideal Image Devel. Corp.*, 2008 WL 5235131, *8 (M.D. Fla. Dec. 13, 2008) (denying in part motion to strike unsigned affidavit where party subsequently noted that it had inadvertently filed the unsigned version of the affidavit and provided properly executed affidavit).

As a second basis for striking Nye's Affidavit, Defendants argue that the Affidavit attempts to create a genuine issue of material of fact in that it allegedly conflicts with the prior deposition

---

[4]An unsworn statement made under penalty of perjury, consistent with 28 U.S.C. §1746, however, may be admissible for summary judgment purposes.

9

testimony of Nye, whom Mid-Continent presented in both his individual capacity and in his capacity as Mid-Continent's Rule 30(b)(6), Fed. R. Civ. P., witness.  Specifically, Defendants object to paragraph 6 and part of paragraph 18 of the Affidavit, contending that these aspects of the Affidavit directly contradict Nye's prior deposition testimony.

In the Eleventh Circuit, "'[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact [for summary judgment], that party cannot thereafter create such an issue with an affidavit that merely contradicts, *without explanation,* previously given clear testimony.'  Such an affidavit would be a sham." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n. 7 (11th Cir. 2003) (quoting *Van T. Junkins & Assocs., Inc. v. U.S. Industries, Inc.,* 736 F.2d 656, 657 (11th Cir. 1984) (emphasis added by *McCormick* Court). As a result, where the offering party fails to set forth a valid explanation for the change, a court may strike the offending portions of the affidavit.  *Id.* at 656-658.

In order to be stricken as a sham, an affidavit must be inherently inconsistent.  *See, e.g., Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1530 (11th Cir. 1987) (citing to *Tippens v. Celotex Corp.*, 805 F.2d 949, 953-54 (11th Cir. 1986)).  When an affidavit contains a satisfactory explanation of the contradictions between it and the affiant's earlier testimony, or when newly discovered evidence furnishes a good-faith basis for any inconsistency between the two, however, the Court may consider such an affidavit.  *See, e.g., Clay v. Equifax, Inc.,* 762 F.2d 952 (11th Cir. 1985).

Pursuant to this standard, this Court has conducted a detailed review of Nye's deposition transcript and his Affidavit and finds that paragraphs 6 and 18 of Nye's Affidavit do not contradict his deposition testimony.  In paragraph 6 of Nye's Affidavit, Nye states, "Prior to [August 14, 2007]

. . . , no unit owners other than Bogosian[5] had advised Mid-Continent of their claim against First State." D.E. 207-1 at 2, ¶ 6; *see also* ¶ 5. In support of their Motion to Strike the Nye Affidavit, Defendants point to the following Nye deposition testimony as conflicting with the statement in paragraph 6:

> Q:   If you receive a notice of a claim and you send out a field adjuster to investigate that claim and your field adjuster is then notified by the claimant that there are additional and other claimants, then I just want to confirm, you consider that to be notice of the claim, is that correct.
>
> . . . .
>
> NYE:  Yes.

D.E. 115-2 at 19:8-17[6] ("Notice Response"). Defendants also direct the Court to the following Nye testimony regarding Lydia Hollander, an independent adjuster hired by Mid-Continent to investigate Bogosian's claim, and assert that it, too, conflicts with paragraph 6:

> Q: . . . According to Lydia Hollander's report, on October 17th, 2006, . . . Mid-Continent had knowledge that wind-driven rain had gone into units other than Mr. Bogosian's, correct?
>
> . . .
>
> NYE:  Yes.

D.E. 115-2 at 119:18-25 ("Hollander Response"). Additionally, Defendants point to Bogosian's

---

[5]As discussed further below, "Bogosian" refers to Wane Mark Bogosian, a unit owner in Defendant Southgate Gardens Condominium Association, who filed a claim with Mid-Continent and obtained a settlement.

[6]Some docket entries, including this one, have two page-numbering systems resulting in different page numbers on the same page: the page number of the original document and the page number imprinted across the top of the page by the Court's CM/ECF system. With respect to deposition transcripts that are produced in "Minu-script" form, the Court refers to the deposition page numbers, not the page numbers left by the CM/ECF system. As for all other documents, however, this Report and Recommendation refers to the page numbers left by the Court's CM/ECF system.

deposition testimony for the proposition that Bogosian notified Hollander on December 22, 2006, that Bogosian planned to bring claims on behalf of Southgate Gardens Condominiums against Mid-Continent.

The Court does not agree with Defendants that Nye's statement in paragraph 6 is inconsistent with *Nye*'s deposition testimony. First, the Court does not consider Bogosian's testimony in the analysis since Bogosian's testimony does not bear on whether Nye contradicted himself.

Second, Nye's Notice Response during his deposition regards the ways in which he understands Mid-Continent to receive "notice of a claim" *in general*, whereas Nye's Affidavit speaks to whether Nye, on behalf of Mid-Continent, received notice of a *specific* claim. Thus, no contradiction between the two statements exists.

Second, while Nye's Hollander Response in his deposition testimony indicates that Nye was aware that wind-driven rain had entered units other than Bogosian's, contrary to Defendants' suggestion, this response does not suggest that unit owners other than Bogosian had advised Mid-Continent of their *claims* against First State. Indeed, later in his deposition, Nye testified that Mid-Continent had no knowledge that any other unit owners planned on making any claims. *See* D.E 115-2 at 120:1-9. As a result, the Court finds that paragraph 6 of Nye's affidavit does not conflict with Nye's deposition testimony.

Next, the Court turns to the disputed portions of paragraph 18 of Nye's Affidavit:

> 18.     As a result of the insured's lack of cooperation, Mid-Continent was unable to fully investigate or defend these matters. For example, it was unable to . . . obtain the insured's version of what damage, if any[,] was caused by First State . . . to Southgate, the condition of the Southgate Gardens or individual units as of November 1, 2009[,] . . . or First State's complete job file which was the best evidence of whether First State may have hired sub-contractors to perform any of the work that was allegedly defectively performed.

D.E. 207-1 at 3-4, ¶ 18.  Defendants contend that this statement contradicts Nye's testimony that Mid-Continent (1) was able to determine that First State had direct responsibility to perform the roofing; (2) was able to determine that First State hired a sub-contractor to assist in repair work; (3) was able to determine that First State had left open certain portions of the roof (mansards) causing damages; (4) was able to learn about First State's work on interiors to the Southgate Gardens property; (5) was able to learned through a statement from First State about wind-driven rain that had entered the buildings; and (6) acknowledged that Hollander had inspected the property twice before November 1, 2009.

The Court disagrees.  First, comparison of the challenged portions of paragraph 18 with the parts of Nye's deposition testimony to which Defendants direct the Court reveals nothing inherently inconsistent in the two.  The fact that Mid-Continent may have been able to make certain determinations and learn of some details regarding the Southgate Gardens claim does not necessarily mean that Mid-Continent was able to investigate the Southgate Gardens claim *fully*.  Similarly, none of the determinations, knowledge, or acknowledgments cited by Defendants demonstrate that Mid-Continent was able to obtain First State's version of "what damage, if any[,] was caused by First State . . . to Southgate, the condition of the Southgate Gardens or individual units as of November 1, 2009[,] . . . or First State's complete job file."  Nor do any of Defendants' citations indicate that Mid-Continent ever suggested that anything other than First State's complete job file would have provided the best evidence of whether First State may have hired sub-contractors to perform any of the work that was allegedly defectively performed.  Because the Affidavit does not conflict with Nye's deposition testimony, striking is not appropriate.

Moreover, review of Nye's deposition reveals that his Affidavit is actually consistent with his deposition testimony.  More specifically, although Nye acknowledged in his deposition that Mid-

13

Continent received from other sources some information that it sought originally from First State, Nye never asserted that based on such information, Mid-Continent could complete its investigation of the claims at issue, and Nye confirmed that it needed First State's assistance to investigate the claim, consistent with paragraph 18 of his Affidavit. *See* D.E. 115-2 at 105:13-17; 59:16-24; 72:1-9; 91:5-21; 104:16-20; 160:4-162:8; 108:13-17.

For example, while Nye confirmed that during First State's cooperation on the Bogosian claim investigation, First State acknowledged that wind-driven rain had entered the buildings after First State started its work on the property and that First State had left the mansard portion of roofs open, Nye also affirmatively stated in his deposition that Mid-Continent could not rely upon First State's initial cooperation on the Bogosian claim in investigating the Southgate Gardens claim. *See* D.E. 115-2 at 108:13-17. Furthermore, in his deposition, Nye explained that because Mid-Continent was unable to schedule an inspection with Southgate, Mid-Continent could not establish why water had entered the buildings. *See* D.E. 115-2 at 59:16-24.

Similarly, Nye affirmed in his deposition that Mid-Continent needed First State's files in order to discover the specific work First State performed at Southgate Gardens and any problems associated with its work, and Mid-Continent could not obtain such information without First State's cooperation. *See* D.E. 115-2 at 91:5-21; 160:4-161:13; 108:2-17. As represented by Nye in his deposition, First State never provided such information. *See* D.E. 108:2-12.

Nye further stated that because First State never allowed Mid-Continent to review its files, Mid-Continent could not fully determine what the buildings looked like before First State began its work in order to determine the extent of damages allegedly caused by First State, as opposed to damages caused by the hurricane that precipitated Southgate's hiring of First State. *See* D.E. 115-2 at 72:1-9; 104:16-20; 160:4-162:8. Although Nye recognized in his deposition that First State

14

informed Hollander that it had used sub-contractors, Nye's deposition testimony indicates that because First State did not provide its files, Nye did not know if there were any contracts regarding work or the contents of those contracts necessary to investigate a claim. *See* D.E. 115-2 at 160:4-18; 91:5-20. Finally, to the extent that Nye confirmed in his deposition that Hollander visited the property, Nye stated that Hollander only performed a "general overview" during her visit and did not perform an inspection. *See* D.E. 115-2 at 62:10-63:11. In short, Defendants have not demonstrated a basis for striking Nye's Affidavit; accordingly, by separate order, Defendants' Motion is **DENIED** in this regard.

### 2. Keith Nye's Errata Sheet for His Deposition Testimony

In their Motion to Strike as it pertains to Nye's errata sheet, Defendants argue that Nye's errata sheet for his deposition should be stricken because it fails to comply with Rule 30(e), Fed. R. Civ. P. According to Defendants, Plaintiff's attorney received Nye's deposition transcript on November 8, 2009, and Plaintiff filed the unsigned, uncertified errata sheet on December 30, 2009 [*see* D.E. 163]. As a basis for striking the errata sheet, Defendants contend that Plaintiff produced the Nye errata sheet well after the 30-day deadline and failed to provide a signed and certified errata sheet, in contravention of the requirements set forth in Rule 30(e), Fed. R. Civ. P. Defendants also assert that the Nye errata sheet attempts to change Nye's deposition testimony substantively in a manner that affects the heart of Plaintiff's case and violates the scope of Rule 30(e). According to case law, Defendants contend, Rule 30(e) does not allow for substantive changes to deposition testimony through the submission of errata sheets.

In its Opposition to Defendants' Motion, Plaintiff argues that Nye's errata sheet complies with the requirements of Rule 30(e) and that the errata sheet does not substantively change Nye's testimony. Moreover, contrary to Defendants' position, Plaintiff asserts that Rule 30(e) permits a

party to make substantive changes to a deposition transcript through the submission of an errata sheet. In this regard, Plaintiff urges that the plain language of Rule 30(e) and the case law of the Eleventh Circuit allow for substantive changes. Plaintiff also contends that Nye's errata sheet changes do not contradict his deposition testimony. Along with the filing of its Opposition, Plaintiff provided a signed and notarized errata sheet for Nye dated January 29, 2010, that it represents was sent to the court reporter from Nye's deposition. *See* D.E. 232-4.

The Court starts by looking to Rule 30(e), which provides,

> (1)     . . .  On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:
>
>    (A)    to review the transcript or recording; and
>
>    (B)    if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.
>
> (2)    . . .  The officer must note in the certificate [that must accompany the record] . . .whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

*Id.* The plain language of the rule requires that the deponent provide the errata sheet within thirty days of being notified that the transcript is available, and failure to do so can constitute grounds to strike an errata sheet. *See Welch v. Mercer University*, 304 F. App'x 834, 838 (11th Cir. 2009) (on appeal for grant of summary judgment against plaintiff, the court of appeals affirmed the lower court's striking of plaintiff's deposition errata sheet for failure to provide the errata sheet within thirty days of production of the transcript to plaintiff as required by Rule 30(e)); *Ross v. City of Perry, Ga.*, 2009 WL 3190450, * 6 (M.D. Fla. Sept. 30, 2009) (finding submission of errata sheet 98 days after sheet was due was time-barred and striking errata sheet for failure to comply with Rule

30(e)).

The 30-day requirement set forth in Rule 30(e) seeks to prevent any abuse or unfair surprise for the benefit of all parties. "[I]f a deponent is going to change his/her testimony in 'form or substance,' the parties need to know that promptly to guide subsequent discovery efforts and trial preparation." *In re Kugel Mesh Hernia Repair Patch Litigation*, 2010 WL 678092, *2 (D.R.I. Feb. 24, 2010) (striking errata sheet, in part, for failing to meet 30-day deadline set forth in Rule 30(e)).

Turning to Defendants' Motion, the Court finds sufficient grounds to strike the Nye errata sheet. Applying Rule 30(e), Fed. R. Civ. P., to the facts of this case, the Court finds that the filing of Nye's errata sheet on December 30, 2009, 59 days after Defendants' undisputed representation of the delivery date of a copy of Nye's deposition transcript to Plaintiff's counsel on November 8, 2009, violates the 30-day requirement set forth in Rule 30(e). Compounding the Rule 30(e) transgression, the December 30, 2009, Nye errata sheet was unsigned and uncertified. While Plaintiff later provided a signed and notarized version of Nye's errata sheet to Defendants, the signed and notarized version of the Nye errata sheet reveals a signing date of January 27, 2010 – more than 86 days after delivery of the transcript to Plaintiff's counsel, and even further outside the 30-day requirement set forth in Rule 30(e). Nor did Plaintiff make any attempt to provide an explanation or otherwise establish good cause for the out-of-time production of the Nye errata sheet.

The deadline for submission of Nye's errata sheet was December 8, 2009, within the December 28, 2009, discovery deadline in this case. Had Plaintiff timely provided the errata sheet by December 8, 2009, any questions regarding the substantive nature of Nye's errata sheet changes could have been addressed as part of the discovery process. Instead, however, Plaintiff submitted the errata sheet on December 29, 2009 – the day after discovery in this matter closed. This is precisely what the 30-day deadline seeks to prevent.

Thus, the Court strikes the errata sheet for failure to comply with the 30-day rule.   *See*

*Welch*, 304 F. App'x at 838; *Ross*, 2009 WL 3190450, at * 6.  As the Court strikes Nye's errata sheet

on this basis, the remainder of Defendants' arguments concerning Nye's errata sheet are moot.

In sum, the Court denies Defendants' Motion to Strike as it seeks to exclude the Nye

Affidavit and will consider the Nye Affidavit in determination of the pending Motions for Summary

Judgment.  On the other hand, the Court grants Defendants' Motion to Strike as it requests to strike

the Nye errata sheet and shall not consider the errata sheet in the determination of the pending

Motions for Summary Judgment.  Thus, by separate order, the Court **DENIES IN PART and**

**GRANTS IN PART** Defendants' Motion to Strike [D.E. 208].

### III. Undisputed Material Facts

The Court now turns to the pending Motions for Summary Judgment and sets forth the

undisputed material facts.

On October 24 and 25, 2005, Hurricane Wilma struck South Florida and caused damage to

some of the buildings at Southgate.  D.E. 167-1, ¶ 4; D.E. 114, ¶ 1; D.E. 108, ¶ 1.  In order to repair

the damage caused by Hurricane Wilma, Southgate hired First State.  D.E. 114, ¶ 2.  On or about

November 1, 2005, First State issued an invoice to Southgate for "tarping."  D.E. 108, ¶ 2; D.E. 114-

3.  The invoice indicated that the work for which it was billing was completed on November 1, 2005.

D.E. 114-3.  Subsequently, on November 11, 2005, First State entered into a contract with Southgate

to remove and replace the roofs of the Southgate buildings, remove debris, and "re-do interior as

scoped by ins[urance] co[mpany] & contractor."  D.E. 114-2.

Upon First State's arrival at Southgate, First State attempted to place tarps on the buildings

to protect them against damage.  D.E. 114, ¶ 4; D.E. 160-1 at 21; D.E. 118-1 at 42.  The tarps placed

by First State were either inadequate or did not stay in place.  D.E. 114, ¶ 5; D.E. 160-1 at 21; D.E.

18

118-1 at 42.  As a result, water entered the unit of Wane Bogosian ("Bogosian").  D.E. 114, ¶ 5.

Bogosian's unit is located in Building 11 of Southgate Gardens.  D.E. 167-1, ¶ 13.

In attaching the tarps, First State caused holes to be made in the roofs of buildings at

Southgate, leading to additional interior damage.   D.E. 108, ¶ 3; D.E. 118-1 at 42, 73, 107, 111.[7]

First State also left the mansards[8] open.  D.E. 167-1, ¶ 8.  In addition, the peeled back condition of

the roofing left the interior of the buildings exposed to the elements, and some rain entered through

those openings.  D.E. 108, ¶ 18.

Prior to Southgate's hiring of First State, Mid-Continent entered into a contract of insurance

with First State, policy number 04-GL-000608900 ("Policy").  D.E. 167-1, ¶ 11;  D.E. 108, ¶¶ 5-6.

The Policy was in full force and effect from October 28, 2005, through October 28, 2006.  D.E. 108,

¶ 7.  On the contract, the address of First State is listed as 1562 N.E. "Qwayside" Terr., Miami, FL

33138.  D.E. 167-1, ¶ 46.  At the time of the claim, First State was insured by Mid-Continent under

the Policy.  D.E. 114, ¶ 7.  On September 11, 2006, Bogosian presented to Mid-Continent a claim

for damages allegedly stemming from First State's work.  D.E. 114, ¶ 6;  D.E. 108, ¶ 8.

Mid-Continent opened a claim for Bogosian on September 15, 2006, under the claim number

---

[7]Mid-Continent attempts to controvert this proposed fact in its Response to Southgate's
Statement of Material Facts.  *See* D.E. 168 at ¶ 3.  The evidence it cites in support of its position,
however, does not actually refute Southgate's proposed fact.  As noted previously, Local Rule
7.5, S.D. Fla., requires a party contravening a proposed material fact to provide specific evidence
to support its position, and failure to do so requires the Court to admit the proposed fact as
undisputed if the Court finds the statement to be supported by evidence.  Because Southgate's
proposed fact is supported by evidence and Mid-Continent has not submitted any evidence
tending to undermine Southgate's evidence on this point, the Court deems it to be undisputed.
The Court will not belabor this Report and Recommendation further with additional similar
footnotes where a proposed material fact is supported by evidence but a proposed contravening
fact is not.  Instead, the Court simply states the fact as though it is undisputed.

[8]A "mansard" refers to a roof having two slopes on all four sides with a lower slope
steeper than the upper one. *See* (9/8/10), http://www.merriam-webster.com/dictionary/mansard.

1900313, and assigned the matter to Jeff Lewis ("Lewis"), a senior adjuster in Mid-Continent's Tampa branch office. D.E. 114, ¶ 8; D.E. 108, ¶ 9. When Lewis interviewed Bogosian, Bogosian stated that First State had torn off the roof of his building in either July or August and had not repaired the roof properly. D.E. 114, ¶ 9. As a result, Bogosian complained, portions of his unit that had not previously been damaged by Hurricane Wilma subsequently sustained damage from water intrusion. D.E. 114, ¶ 9.

In addition, Lewis contacted Ronald Green and David Perry of First State. D.E. 114, ¶ 10; D.E. 114-10 at ¶ 4.[9] On September 20, 2006, First State informed Lewis that First State denied any wrongdoing, and the company refused to complete Mid-Continent's standard building questionnaire that it uses when investigating a claim or to provide any other documentation to Lewis. D.E. 114, ¶ 11.[10] Furthermore, First State denied responsibility for any of the damages in Bogosian's unit and advised Lewis that First State did not want Mid-Continent's assistance. D.E. 114, ¶ 19. In response, Lewis notified the insured of its obligation to cooperate in the investigation of the Bogosian claim and sent letters on October 4 and 25, 2006, reserving its rights. D.E. 114, ¶ 12; D.E. 114-11; D.E. 114-12.

After Lewis met with First State, on October 4, 2006, Lewis hired Frontier Adjusters ("Frontier") to assist in the investigation of the Bogosian claim. D.E. 114, ¶ 13; D.E. 108, ¶ 10;

---

[9]Defendants Basdeo and Southgate purport to contravene this fact, pointing to Lewis's deposition testimony and Exhibit 64 to Lewis's deposition. *See* D.E. 176 at ¶ 3; D.E. 166 at ¶ 2. A review of Lewis's deposition, however, does not contravene Mid-Continent's proposed fact, and Exhibit 64 to Lewis's deposition has not been filed with the Court. Consequently, the Court deems Mid-Continent's proposed fact to be uncontroverted.

[10]Defendants attempt to contravene this fact, *see* D.E. 166 at ¶ 4 & D.E. 176 at ¶ 4, but the portions of the record that they cite do not, in fact, contradict Mid-Continent's proposed fact. To the extent that Defendants again direct the Court to an exhibit from Lewis's deposition, the record contains no such exhibits. As a result, the Court cannot consider them.

D.E. 167-1, ¶¶14, 16.  Frontier assigned Lydia Hollander ("Hollander") to investigate Bogosian's claim.  D.E. 167-1, ¶ 15; D.E. 114, ¶ 14.

According to Hollander's October 17, 2006, report, Hollander met with David Perry, CEO of First State, and interviewed him at First State's office.  D.E. 167-1, ¶ 19;  D.E. 108, ¶11; D.E. 121-1 at 61-67.  Hollander stated in her report that Perry provided her with the names of the construction superintendent, Bobby Cimino, and the job foreman, Justin Ahern, for the Southgate project.  D.E. 108, ¶ 11.  She further indicated in her report that Perry identified the Southgate property manager as Kerry Friedman ("Friedman") of Phoenix Management.   D.E. 108, ¶ 11.

Hollander also stated that according to Perry, First State's assignment was based on the insurance proceeds to be paid by Southgate's insurance company, Aspen Insurance Company ("Aspen").  D.E. 108, ¶ 11.  Additionally, Perry represented to Hollander that he had conducted a walk-through of the property with Aspen.  D.E. 108, ¶ 11.  As set forth in Hollander's report, Perry stated that First State had direct responsibility for the roofing.  D.E. 108, ¶ 11.  Furthermore, Perry informed Hollander of the identity of a sub-contractor named MVM, part of J&J Drywall, whom Perry indicated First State hired to do truss repairs and the balance of the sheathing and shingle work to the roofs.  D.E. 108, ¶ 11. Hollander's report also noted that Perry stated that First State agreed to repair any additional damage that may occur inside the units at no additional charge to Southgate.  D.E. 108, ¶ 11.  Finally, Perry informed Hollander that "wind[-]driven rain has gone into the units, including [Bogosian's unit] . . . ."  D.E. 167-1, ¶ 20;  D.E. 108, ¶ 12.

In her report, Hollander documented that the day after the meeting with Perry, she met with another individual representing First State and examined a portion of First State's job file consisting of some permits and violations.  D.E. 114, ¶ 14.  Hollander requested that First State prepare copies of these documents and make the entire job file available for her review.  D.E. 114, ¶ 14.  First State,

21

however, never did either, despite Hollander's renewed requests in writing and by phone. D.E. 114, ¶ 14.

In the same October 17th report, Hollander stated that on or about October 11, 2006, she met with Wanda Murtadha ("Murtadha"), who identified herself as a director on the board of Southgate. D.E. 167-1, ¶ 17. According to Hollander's report, during the meeting, Murtadha stated to Hollander that 94 units at Southgate had been damaged "either because of Hurricane Wilma or during the construction." D.E. 167-1, ¶ 18.

The October 17th report also detailed the inspection that Hollander conducted at the Southgate property. Hollander stated that on October 11, 2006, she inspected Bogosian's unit and the portion of the roof over Bogosian's unit of Building 11 with property adjuster Frederick Barrie. D.E. 108, ¶ 13. Barrie accompanied Hollander to the Southgate property to write the estimate of damages and to take photographs. D.E. 167-1, ¶ 35; D.E. 114, ¶ 15. While on the roof of the building, Barrie and Hollander caused photographs of the surrounding buildings to be taken and subsequently caused comments to be written regarding the pictures. D.E. 108, ¶ 14; D.E. 168, ¶ 14. Some of the comments stated, "peeled back felt east," "peeled back felt," "pulled back felt," "all 7 roofs are peeled back," and "peeled back eye level." D.E. 108, ¶ 14; D.E. 167-1, ¶ 23; D.E. 122-1 at 7-16. Hollander also remarked, "Attached are several photos of the roof of Building II. In the background, you will see some photos of other roofs. I did not see any tarps available on the property nor were any of the buildings tarped in the event of further rain. I also noted what appeared to be dried out and/or rotten wood as part of the sheathing underneath the roof deck (photo 6 on Page 4 of the photo report)." D.E. 167-1, ¶ 22.

In the preparation of his damages estimate regarding Bogosian's unit, Barrie was not asked to separate the damages caused by Hurricane Wilma from the damages caused by First State. D.E.

167-1, ¶ 36.  The estimate included damage to Bogosian's personal property and to the interior of the unit.  D.E. 114, ¶ 15.

In November of 2006, Mid-Continent, through delivery to Hollander, received a copy of the Southgate and First State contracts for hurricane repairs.  D.E. 108, ¶ 19.  Additionally, on or about December 22, 2006, Hollander spoke to Bogosian over the telephone, and Bogosian stated that "he is now the President of the Association," and that "he would be filing claims against First State . . . on behalf of the Association."  D.E. 167-1, ¶¶ 24, 25;  D.E. 108, ¶ 21; D.E. 114, ¶ 17.  At that time, Hollander asked Bogosian for case numbers of any lawsuits, and he stated that none had been filed yet.  D.E. 114, ¶ 17.

Basdeo testified that as of November 2006,[11]  Southgate members had not "seen [First State] for months . . . ."  D.E. 166, ¶ 11; D.E. 123-1 at 30-31.  On December 29, 2006, in a letter to First State, Robert Kaye, Southgate's attorney, formally terminated its contract with First State for "its on-going material breaches of [the] . . . contract" and opined that "the property has experienced significant damages as a result of the negligence of First State . . . ."   D.E. 108, ¶ 22; D.E. 114, ¶ 34.  Kaye also directed First State to notify its insurer of Southgate's claim.   D.E. 114, ¶ 34.  Although Kaye instructed First State to inform its insurer, First State never provided this letter to Mid-Continent.  D.E. 114, ¶ 34.

At the time that Southgate ended its contract with First State, First State had not completed its work.  D.E. 114, ¶ 35.  In fact, Southgate had to hire three other contractors to finish the exterior

---

[11]Basdeo testified that Perry attended a meeting at Southgate in November 2007 and that First State had not been seen for months prior to the meeting.  It is clear from the rest of her testimony and the record, however, that she was referring to November 2006 because Basdeo explained that First State was terminated after the November meeting, and the record demonstrates that Southgate fired First State on December 29, 2006.

and interior repairs.  D.E. 114, ¶ 35.

During the course of her investigation, Hollander became aware that units at Southgate other than that of Bogosian may have sustained damage allegedly as a result of First State's work.  D.E. 114, ¶ 17. Although as of December 22, 2006, Hollander confirmed that no lawsuits had been filed, as set forth in her February 28, 2007, report, Mid-Continent nevertheless decided to investigate these potential claims.  D.E. 114, ¶ 17.  On July 9, 2007, Mid-Continent opened a separate claim file under number 190053 for the potential claim of Southgate.  D.E. 108, ¶ 28;[12] D.E. 114, ¶ 17. When unit owners other than Bogosian later made claims, Mid-Continent used this same number for them.  D.E. 114, ¶ 17.

Mid-Continent requested that Hollander investigate the potential non-Bogosian Southgate-related claims.  D.E. 114, ¶ 18.  Her new assignment included attempting to contact the insured, obtaining copies of any lawsuits filed against First State, and conducting an investigation with HSA Engineers & Scientists ("HSA"), an engineering firm retained by Mid-Continent, to determine the cause of the alleged damage suffered by Southgate and unit owners other than Bogosian.  D.E. 114, ¶ 18.

On March 12, 2007, Mid-Continent retained HSA.  D.E. 114, ¶ 19.  From March until July, Hollander attempted to arrange for an inspection of Southgate and the individual units.  D.E. 114, ¶ 19.

During this period, on June 12, 2007, Hollander sent a letter on behalf of Mid-Continent to Bogosian which offered to settle his claim against First State for $20,193.19.   D.E. 108, ¶ 24.

---

[12]Although Defendant Southgate relied upon "Exhibit 52" of Gene Hert's deposition for this proposition, *see*  D.E. 108, ¶ 28, the Court understands Southgate to have been referring to Exhibit 52 from Keith Nye's deposition.  *See* D.E. 110 at 1, 110-1 at 83.

Based on Hollander's investigation, Mid-Continent settled Bogosian's claim for $20,193.19 (not including any loss of use) prior to the filing of any lawsuit by Bogosian.  D.E. 114, ¶ 16; D.E. 167-1, ¶ 38.  As a condition of the settlement, Mid-Continent required Bogosian to sign a release and to have Southgate sign a release because the settlement was based, in part, on repairs to property for which Southgate might have some responsibility.   D.E. 108, ¶ 27.

In its description of how Mid-Continent processes claims, Mid-Continent indicated that its standard operating procedure includes the elevation of claims from the regional branch offices to Mid-Continent's home office if a denial of the claim is recommended based on coverage issues. D.E. 108, ¶ 25.  Mid-Continent did not elevate the Bogosian claim to its home office or dispute the Bogosian claim based on any coverage issues.  D.E. 108, ¶ 26.

On or about July 18, 2007, Defendant Basdeo and other individuals she believes are similarly situated to her filed a lawsuit against First State in the Circuit Court of the Judicial Circuit in and for Broward County, Florida ("Basdeo State Case").   D.E. 167-1, ¶ 39.  Basdeo contends that First State damaged roofs, the interior of her unit, and her personal possessions.  D.E. 114, ¶ 24.

The return of service for the Basdeo State Case complaint notes that service was executed on "Judy Brodsky" as First State's "Registered Agent" on July 19, 2007, at 5415 NW 24th Street, Suite, 108, Margate, FL 33063.  D.E. 114, ¶ 27.  "Judy Brodsky" is not listed as the registered agent for First State.  D.E. 114, ¶ 28.

In the Basdeo State Case, Basdeo filed a class action complaint against First State and others, including Southgate, who was ultimately dismissed from the case.  *See* D.E. 1 at 22.  Among other claims, the Basdeo State Case pursued a count of negligence against First State, based on allegations that "personal chattels [such as washers, dryers, refrigerators, and other household

25

appliances] belonging to [Basdeo] and Class members were taken and removed from the interiors of condominium units and removed from the construction site" while First State had control of the construction site.  D.E. 1 at 49, ¶¶ 89-91.

In addition, the Basdeo State Case complaint alleged breach of contract against First State. Among other allegations in this count, the complaint averred, "Roofing at the condominium complex was still in need of repair in December 2006, and considerable collateral damage had subsequently occurred due to condominium units being exposed to the elements. . . ." D.E. 1 at 45, ¶ 73.  The complaint further catalogued damages, noting, among others, "expenses to be incurred associated with additional structural repairs now necessary as a result of the damage done to [Basdeo and the class's] condominiums due to long-term exposure to the elements, and costs associated with replacing the personal property taken from their condominium homes . . . ." *Id.* at 45-46, ¶ 77.

Prior to the filing of the Basdeo State Case in July 2007, neither First State nor any other unit owner advised Mid-Continent of a claim against First State based upon First State's work at Southgate.  D.E. 114, ¶ 26.[13]   Although First State gave a statement to the media about the Basdeo State Case on August 6, 2007, First State never sent a copy of the complaint in the Basdeo State Case to Mid-Continent, and it did not request that Mid-Continent furnish First State with a defense.

---

[13]Defendants point to Hollander's report to support their position that Murtadha put Mid-Continent on notice of Southgate and other unit owners' claims.  *See* D.E. 176, ¶ 8; D.E. 166, ¶ 8.  This is not an accurate description of the contents of Hollander's report as they relate to Hollander's discussion with Murtadha.  *See* D.E. 121-1 at 64-65.  In further contravention of Mid-Continent's proposed fact as set forth above, Southgate asserts without citation to record support that on December 22, 2006, Bogosian, as the president of Southgate, advised Hollander that he was bringing a claim for damages caused by First State.  D.E. 176, ¶ 8.  Setting aside the fact that Defendants have not directed the Court to record support for their position, Hollander's actual summary of Bogosian's statement indicates that he said that the unit owners would be bringing claims, not that claims existed.

D.E. 114, ¶ 29, 30.

Returning to Mid-Continent's actions with regard to Southgate and the unit owners' claims, according to a July 19, 2007, report prepared by Hollander, in furtherance of her investigation, Hollander and Dana Race ("Race"), an engineer from HSA, carried out a "a general overview of pretty much all of buildings" of the Southgate property on July 13, 2007.  D.E. 167-1, ¶ 33;  D.E. 108, ¶ 29; D.E. 121-1, 53-60.  At the time that Hollander and Race visited the property on July 13, 2007, they had intended to conduct a detailed inspection over a three-day period starting on August 14, 2007, in order to attempt to complete Mid-Continent's investigation of Southgate and the individual unit owners' potential claims.  D.E. 114, ¶ 19.  Additionally, Hollander stated in this July 19th report, "As you know we were never able to make any secondary contact with . . . [First State]; their representative was totally non-responsive to my phone calls."  D.E. 167-1, ¶ 32.

Although Hollander and Race had intended to inspect Southgate on August 14, 2007, on August 3, 2007, Southgate's attorney, Dennis Bailey, advised Hollander by e-mail that the unit owners of Southgate had filed suit and that his client, Southgate, would be filing a cross-claim in that suit.  D.E. 114, ¶ 20.  In light of the pending litigation, Bailey wrote, "Consequently, I must rescind our offer to allow you to perform inspections outside the Florida Rules of Civil Procedure."  D.E. 114, ¶ 20.

Without the completion of the inspection and production of certain other requested information from Southgate, Race stated he could not prepare a report and make any determination of the amount or cause of damages to Southgate or to any of the unit owners.  D.E. 114, ¶ 21.  During Hollander's handling of the Southgate and Bogosian claims, Hollander did not contact any of the unit owners to find out whether they had any claims.  D.E. 167-1, ¶ 34.

Upon learning on August 3, 2007, that a lawsuit may have been filed against First State,

Mike Duke ("Duke"), on behalf of Mid-Continent, sent a reservation-of-rights letter to First State on August 8, 2007. D.E. 108, ¶ 31; D.E. 114, ¶ 22; D.E. 114-23. In the August 8th letter, Duke advised First State that it was Mid-Continent's understanding that two separate lawsuits had been filed against First State, one by Southgate and the other by the unit owners. D.E. 114, ¶ 22; D.E. 114-23. Further, Duke stated in the letter that Mid-Continent had been unable to obtain copies of these lawsuits and that "in the event First State . . . is looking for Mid-Continent . . . to assist in the defense of this suit, it is imperative that immediately upon receipt of said suit that [First State] forward the suit to Mid-Continent . . . as soon as possible." D.E. 114, ¶ 22; D.E. 114-23. The letter also sought the cooperation of First State in Mid-Continent's investigation. D.E. 108, ¶ 31; D.E. 114-23. As of August 6, 2007, Mid-Continent had knowledge that First State might not be using the address 5415 N.W. 24th Street, Suite 108, Margate, Florida 33063, anymore. D.E. 108, ¶ 30. Nevertheless, Mid-Continent sent the August 8th reservation-of-rights letter to First State at that address. D.E. 167-1, ¶ 45; D.E. 109-1 at 123-24.

Meanwhile, in late July and early August 2007, Mid-Continent attempted to acquire a copy of the lawsuit allegedly filed by the unit owners from Southgate's counsel and from the court file, but was unsuccessful in obtaining a copy from either source. D.E. 114, ¶ 25. Although the Basdeo State Case previously named Southgate as a party, Southgate's counsel never provided a copy of the Basdeo State Case complaint to Hollander. D.E. 114, ¶ 25. On August, 22, 2007, Basdeo filed a Motion for Default against First State in the Broward County case. D.E. 167-1, ¶ 43; D.E. 114, ¶ 23.

Then, on September 19, 2007, Southgate filed its own complaint seeking damages against First State in Florida state court ("Southgate State Case"). D.E. 108, ¶ 32; D.E. 114, ¶ 31. The affidavit of service for the complaint in the Southgate State case represents that service was made

on "Jane Doe" on behalf of First State November 30, 2007.  D.E. 114, ¶ 37.  It further attests that

the process server visited the following four locations to serve the complaint on First State: 5115

N.W. 65th Terr., Coral Springs, Florida; 5415 N.W. 24th Street at Suites 107, 108, and 109, Margate,

Florida; 1562 N.E. Quayside Terrace, Miami, Florida; and 1512 N.E. Quayside Terr., Miami,

Florida.  D.E. 114, ¶ 37.

The Southgate State Case complaint alleged that First State had inflicted damage on

Southgate in the following ways, among others:

> 12.     . . . [M]embers of the Plaintiff Southgate . . . are incurring .
> . . future expenses associated with replacing the personal
> property wrong[f]ully taken from their condominium
> residences by Defendant First State . . . .
>
> 24.     . . . Defendant First State subjected Plaintiff Southgate . . . to
> considerable wrongful conversion of private property and/or
> significant and material collateral damage had subsequently
> occurred due to condominium units being exposed to the
> elements which directly and/or proximately caused or
> contributed to the cause of harmful bacterial growth inside
> the residences and Defendant First State failed to treat said
> harmful condition in a workmanlike manner.
>
> 35.     The manner in which the agents and/or employees of
> Defendant First State performed work on or involving the
> property of Plaintiff Southgate . . . to further the interests of
> Defendant First State, at all time[s] material to this
> Complaint, unnecessarily damaged the property of Plaintiff
> Southgate . . . beyond the actual work inherently involved in
> the contracted activities.

D.E. 114-1.

Returning to the Basdeo State Case, on October 3, 2007, Joe M. Mitchell ("Mitchell"),

Basdeo's attorney at the time, notified Mid-Continent of the Basdeo State Case and the granting of

her August 22, 2007, motion for default.  D.E. 167-1, ¶ 43; D.E. 114, ¶ 33.  This was the first time

that Mid-Continent received a copy of the Basdeo State Case or the initial default.  D.E. 114, ¶ 33.

Mitchell represented that service of the amended complaint in the Basdeo State Case took place on December 20, 2007.  D.E. 114, ¶ 33.

On January 24, 2008, Southgate's counsel notified Mid-Continent of the Southgate State Case.  D.E. 108, ¶ 34; D.E. 114, ¶ 36.  Prior to receipt of the January 24, 2008, facsimile containing a copy of the complaint and affidavit of service, Mid-Continent had no knowledge that a suit had been filed against First State.  D.E. 114, ¶ 38; D.E. 114-33.   First State never sent a copy of the Southgate State Case to Mid-Continent, and it made no request of Mid-Continent to defend it in the matter.  D.E. 114, ¶ 32.  At no time from the receipt of the lawsuit in the Southgate State Case has Mid-Continent hired an attorney to enter an appearance on behalf of First State to defend it in the Southgate State Case.  D.E. 108, ¶ 36.  In reference to the Southgate State Case, Mid-Continent's attorney stipulated in the course of the instant litigation, "Southgate's Complaint in part alleges an occurrence" under First State's policy with Mid-Continent.  D.E. 108, ¶ 35.

On February 29, 2008, attorney Ronald L. Kammer ("Kammer"), on behalf of Mid-Continent sent a letter to First State at 5415 N.W. 24th Street, Suite 108, Margate, Florida  33063.  D.E. 108, ¶ 39; D.E. 114, ¶ 40.  The letter asked First State whether it wanted Mid-Continent to appoint counsel to defend First State in the Basdeo and Southgate matters.  D.E. 114, ¶ 40.  Kammer represents that he sent this letter to the same address as reflected on the return of service of the Basdeo State Complaint.  D.E. 114, ¶41.

On the same date, Kammer sent a letter to Bailey, Southgate's counsel, advising Southgate of First State's lack of cooperation and other coverage issues.  D.E. 114, ¶ 42.  In the letter, Kammer asked Bailey for any information that might assist Mid-Continent in locating or securing First State's cooperation.  D.E. 114, ¶42.  Mitchell did not provide any information to Kammer regarding the whereabouts of First State or any of its officers.  D.E. 114, ¶ 42.

30

Similarly, on February 29, 2008, Kammer sent another letter to Mitchell, Basdeo's counsel, advising Basdeo of First State's lack of cooperation and other coverage issues. D.E. 114, ¶ 43. In the letter, Kammer asked Bailey for any information that might assist Mid-Continent in locating or securing First State's cooperation. D.E. 114, ¶ 43. Bailey did not provide any information to Kammer regarding the whereabouts of First State or any of its officers. D.E. 114, ¶ 43

On March 6, 2008, the state court entered a Final Judgment of Default against First State in the Basdeo State Case. D.E. 167-1, ¶ 44; D.E. 114, ¶ 33.

Mid-Continent's February 29, 2008, certified letter to First State was returned to Kammer as unclaimed. D.E. 108, ¶ 4; D.E. 114, ¶ 44. On March 27, 2008, therefore, Kammer retained the services of The Wasser Agency, Inc., a private investigation firm, to locate and personally deliver copies of legal documents and correspondence to the three alleged officers of First State: Ronald Green, David Perry, and Steven Kiser. D.E. 108, ¶ 4; D.E. 114, ¶ 44.

Investigator Bill Wallace ("Wallace") of The Wasser Agency conducted an investigation and attempted to locate First State and its officers on March 27, 2008. D.E. 114, ¶ 45. Wallace, however, did not successfully locate or make contact with First State after visiting the residential and business addresses of First State's officers and the location where First State was known to have conducted its businesses. D.E. 114, ¶ 45. Thus, Wallace could not complete delivery of legal documents to any of the officers. D.E. 108, ¶ 42. As of the date of his visit on March 27, 2008, Investigator Wallace confirmed that the address of 5415 N.W. 24th Street, Suite 108, Margate, Florida 33063, was vacant. D.E. 108, ¶ 43. On April 11, 2008, on behalf of Mid-Continent, Kammer sent another letter seeking cooperation to First State at the same vacant address. D.E. 108, ¶¶ 44, 45. Kammer sent a letter on behalf of Mid-Continent denying coverage on April 17, 2008 – once again to the same vacant address. D.E. 108, ¶ 45; D.E. 114, ¶ 47.

31

On April 4, 2008, the state court entered a final default judgment against First State in the Southgate State Case.  D.E. 114, ¶ 48.  The final default judgment indicated First State's registered agent as Ronald Green at the address of 5415 N.W. 24th Street, Suite 108, Margate, Florida 33063.  D.E. 114, ¶ 48.  On April 17, 2008, Mid-Continent withdrew its reservation-of-rights letter and denied coverage to First State for both the Basdeo and Southgate State Cases.  D.E. 114, ¶ 47.

On June 11, 2008, the state court entered a final judgment on liability against First State in the Southgate State Case.  D.E. 114, ¶ 49.  The final judgment on liability indicated that the state court provided a copy of the judgment to First State's registered agent, Ronald Green, at the address of 5415 N.W. 24th Street, Suite 108, Margate, Florida 33063.  D.E. 114, ¶ 49.  At no time following the entry of the Clerk's default and the motion for final default judgment on liability in Southgate's State Case did Mid-Continent take any action to hire an attorney to enter an appearance on behalf of First State or otherwise to contest the default and attempt to have it set aside.  D.E. 108, ¶ 38.

On September 12, 2008, on behalf of Mid-Continent, Kammer sent another letter to First State at 5415 N.W. 24th Street, Suite 108, Margate, Florida  33063.  D.E. 108, ¶ 46.

Mid-Continent has not obtained from First State a non-waiver agreement regarding the Basdeo State Case.  D.E. 167-1, ¶ 47.  Mid-Continent failed to retain independent counsel on behalf of First State to represent its interests in the Southgate State Case.  D.E. 108, ¶ 56.  Nor did Mid-Continent retain an attorney to defend First State in the Basdeo Case.  D.E. 114, ¶ 46.

In response to the question whether "[First State] did cooperate to some extent [with Mid-Continent]," Hollander characterized First State's "cooperation" as follows:  "I was given some time with Mr. Perry."  D.E. 108, ¶ 52.  During her deposition testimony, Hollander detailed that she had an in-person meeting with Perry of First State between October 4th and 17th and spoke to him over the telephone to set up the appointment.  D.E. 108, ¶ 52.  Likewise, in response to the question

32

whether "First State, did, in fact, cooperate to an extent with regard[] to claims arising from the Southgate property," Keith Nye responded, "Yes."    D.E. 108, ¶ 52.

On November 17, 2009, Mid-Continent filed the five-count Amended Complaint in this case.  D.E. 167-1, ¶¶ 1, 2.

## IV.  Analysis

### A.    The Pending Summary Judgment Motions

In this case, the parties filed cross-motions for summary judgment.  More specifically, Mid-Continent filed two separate Motions for Summary Judgment – one on Counts I and II of its Amended Complaint [D.E. 112] and one on its affirmative defenses to Southgate's Counter-Claim [D.E. 111].  In addition, Defendant Southgate filed a Motion for Summary Judgment seeking summary judgment on Mid-Continent's Amended Complaint and Southgate's Counter-Claim [D.E. 107], and Defendant Basdeo filed a Motion for Summary Judgment seeking summary judgment on Mid-Continent's Amended Complaint [D.E. 106].

The Court begins with a summary of the counts and defenses relevant to resolution of the parties' Motions for Summary Judgment.   Mid-Continent's Amended Complaint requests declaratory relief finding the following:

> **Count I**  -  No Duty to Defend First State;
>
> **Count II** - No Cooperation by First State;
>
> **Count III** - Mid-Continent's Limit of Liability is $1 Million;
>
> **Count IV** - A Single Occurrence Transpired; and
>
> **Count V** - The Application of the Mold and Damage to Property Exclusions Preclude Coverage under the Policy.

D.E. 96.

In response, Defendants Basdeo and Southgate assert affirmative defenses.  D.E. 88, 127. Additionally, Southgate filed a one-count Counter-Claim seeking a declaratory judgment finding that (1) Mid-Continent has a duty to defend First State; (2) Mid-Continent is estopped from declining to defend and indemnify First State; (3) Mid-Continent has waived its non-cooperation defense; and (4) Mid-Continent cannot demonstrate prejudice resulting from the alleged non-cooperation of First State.  *See* D.E. 127 at 17-21.

In opposition to the Counter-Claim, Mid-Continent filed an Answer and asserted affirmative defenses.  D.E. 148.  Mid-Continent's affirmative defenses relevant to the determination of the pending Motions for Summary Judgment include the following:

> **Sixth Affirmative Defense** - Coverage Excludes Alleged "Operations" Damages;
>
> **Seventh Affirmative Defense** - No Coverage for Loss of Use Damage;
>
> **Ninth Affirmative Defense** - Coverage Excludes Damages Resulting from Mold and Fungus;
>
> **Fifteenth Affirmative Defense** - No Coverage for "Property" Damage;
>
> **Seventeenth Affirmative Defense -** Policy Liability Limits Amount of Coverage; and
>
> **Twentieth Affirmative Defense** - Other Policy Exclusions Limit Coverage.

D.E.  148 at 3-6.

In the pending Motions, Mid-Continent seeks for the Court to grant summary judgment regarding its requests for declaratory judgment in its Amended Complaint under Counts I and II, and its Sixth, Seventh, Ninth, and Fifteenth Affirmative Defenses.  Southgate and Basdeo's Motions for Summary Judgment regard Counts I through V of Plaintiff's Amended Complaint and their

34

affirmative defenses generally.   Defendant Southgate's Motion For Summary Judgment also requests that the Court grant summary judgment regarding all of its Counter-Claims.

**B.**     **Summary Judgment Standard and Governing Law**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Not any factual dispute will defeat a motion for summary judgment; rather, "the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis in original).  An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  A fact is material if it "might affect the outcome of the suit under the governing law . . . ." *Id.* (quoting *Anderson*, 477 U.S. at 247-48).

On a motion for summary judgment, the Court views the evidence, including all reasonable inferences drawn from it, in the light most favorable to the non-moving party and resolves all reasonable doubts against the movant.  *Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002); *Johnson v. City of Mobile*, 321 F. App'x 826, 830 (11th Cir. 2009).  The Court does not weigh conflicting evidence.  *Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007), *reh'g and reh'g en banc denied*, 254 F. App'x 803 (11th Cir. 2007).  Thus, upon discovering a genuine material dispute, the Court promptly must deny summary judgment.  *Id.*

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact.  *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).  Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819,

35

825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).   Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'"   *Id.*   (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).   Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by his own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts suggesting that a reasonable jury could find in his favor.   *Shiver*, 549 F.3d at 1343.

As the duty of an insurer rests upon the legal effect of the provisions of an insurance policy, the interpretation of the policy is a matter of law for the Court to determine, and is therefore amenable to summary judgment.   *Nat'l Union Fire Ins. Co. of Pittsburgh v. Brown*, 787 F.Supp. 1424, 1427 (S.D. Fla.1991) (citing *Gulf Tampa Drydock Co. v. Great Atl. Ins. Co.*, 757 F.2d 1172, 1174 (11th Cir.1985)). "Summary judgment is appropriate in declaratory judgment actions seeking a declaration of coverage when the insurer's duty, if any, rests solely on the applicability of the insurance policy, the construction and effect of which is a matter of law." *Northland Cas. Co. v. HBE Corp.*, 160 F. Supp. 2d 1348, 1358 (M.D. Fla.2001) (citing *Talat Enter., Inc. v. Aetna Life & Cas.*, 952 F.Supp. 773 (M.D. Fla.1996)).

Since Plaintiffs premise jurisdiction in this case on diversity grounds, the Court must determine the law applicable to this matter by looking to Florida's choice-of-law rules.   *Adolfo House Distributing Corp. v. Travelers Property and Casualty Ins. Co.*, 165 F. Supp. 2d 1332, 1335 (S.D. Fla. 2001) ("*Adolfo House*") (citing *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1515 (11th Cir. 1997); *Bituminous Casualty Corp. v. Advanced Adhesive Technology, Inc.*, 73 F.3d 335, 337 (11th Cir. 1996))).   In consulting Florida's laws, the Court first considers rulings of Florida's Supreme Court.   *See Bailey v. Southern Pacific Transp. Co.*, 613 F.2d 1385, 1388 (5th

Cir.), *cert. denied*, 449 U.S. 836 (1980).  Where the highest court in the state has rendered no decisions on point, however, this Court must follow the opinions of Florida's intermediate courts, unless it is "convinced that the highest court would decide otherwise." *Id.* (citing *Commissioner v. Bosch*, 387 U.S. 456, 465 (1967)).

As Florida law pertains to choice of law in the context of contract interpretation, the Florida Supreme Court has "long adhered" to the rule of *lex loci contractus*. *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, 1163 (Fla. 2006).  In the context of insurance contracts, that rule provides that the law of the jurisdiction where the contract was executed governs the rights and liabilities of the parties in determining an issue of insurance coverage. *Id.* (citing *Sturiano v. Brooks*, 523 So. 2d 1126, 1129 (Fla. 1988)).  The place where the contract was executed is "generally considered to be the place where the policy is delivered." *Adolfo House*, 165 F. Supp. 2d at 1335 (citing *Sturiano v. Brooks*, *supra*, and *Bloch v. Berkshire Ins. Co.*, 585 So. 2d 1137 (Fla. 3d Dist. Ct. App. 1991)).

In this case the Mid-Continent Policy at issue reflects a mailing address for First State, as well as for its registered agent, in Florida, thereby suggesting that the policy was delivered in Florida. *See* D.E. 105-4 at 2.  Moreover, the policy reflects that it was counter-signed in Florida, further indicating that the policy was delivered in Florida. *See id.*  Finally, the parties' reliance in their briefs on Florida law implicitly recognizes that Florida law governs this dispute.

C.   **Analysis of the Parties' Motions**

      *1.   An Insured Need Not Ask for a Defense to Trigger the Insurer's Duties Under the Policy if the Policy Does Not Require an Insured to Do So*

Count I of the Amended Complaint seeks a declaratory judgment finding that no duty to defend or indemnify First State was ever triggered because First State never requested a defense.

More specifically, in Count I Mid-Continent argues that it had no duty to defend or indemnify First State because First State failed to tender its defense to Mid-Continent, and only an insured can trigger an insurer's obligation to defend or indemnify.  In support of it position, Mid-Continent relies upon *Am. States Ins. Co. v. Pioneer Elec. Co.*, 85 F. Supp. 2d 1337 (S.D. Fla. 2000); *Hartford Accident & Indem. Co. v. Gulf Ins. Co.*, 776 F.2d 1380, 1383 (7th Cir. 1985); and *Arrow Elec., Inc. v. Fed. Ins. Co.*, 2002 WL 172662 (Conn. Super. Ct. Jan. 7, 2002), for the proposition that where an insured never tendered its defense to the insurer, the insurer has no duty to defend the insured. Mid-Continent also points to other jurisdictions that purportedly follow the same rule with respect to the duty to defend.

In further developing its argument, Mid-Continent suggests that the requirement that an insured request a defense finds its foundation in maintaining the consensual nature of the client-lawyer relationship.  Without a client, Mid-Continent reasons, a lawyer cannot comply with the obligations under the Model Rules not to reveal information relating to the client's representation without the client's consent or not to accept compensation from a third person without the client's informed consent.  Noting that the Model Rules require a lawyer to "abide by a client's decisions concerning the objectives of representation and . . . [to] consult with the client as to the means by which they are to be pursued, Mid-Continent asserts that in the absence of being able to communicate with First State, Mid-Continent cannot know First State's desired legal strategy, and, thus, cannot comport with the Model Rules.

Expanding this argument to the rules that govern Florida lawyers, Mid-Continent asserts that Florida Bar Rule 4-1.8(j) requires that a lawyer appointed by an insurer to represent an insured must inform and serve a perspective client with a Statement of Client's Rights.  D.E. 112 at 7.  If the insured cannot be found or does not cooperate, however, Mid-Continent reasons, this Statement of

Client's Rights designed to protect policyholders is meaningless.  Further, to the extent that First State fails to cooperate, Mid-Continent suggests, under the Florida Claims Administration Statute, 627.426, Fla. Stat. ("FCAS"), First State would be entitled to independent and mutually agreeable counsel as required by the Policy.  Yet, Mid-Continent complains, "[W]ithout First State's cooperation it was impossible for Mid-Continent to unilaterally appoint counsel if it wanted to preserve its coverage defenses."  D.E. 112 at 7.

Mid-Continent views the law, FCAS, and policy to support a determination that an insured must request a defense. Applying the law to the facts of the case, Mid-Continent contends that the facts show that First State failed to provide Mid-Continent with notice of the lawsuits, failed to request a defense from Mid-Continent, and informed Mid-Continent's adjuster that First State did not want Mid-Continent's assistance. Thus, according to Mid-Continent, as a matter of law, its duty to defend was never triggered.

In support of their Motions for Summary Judgment on Count I, Southgate and Basdeo contend that First State had no duty to request a defense under the Policy, applicable case law, or Florida statutory law.  Defendants  assert that the Policy includes no provision that required First State to request a defense.  Although Mid-Continent points to the cooperation provision of its policy as indicative of First State's duty to request a defense, Defendants assert that the deposition testimony by Mid-Continent corporate representative Nye, who admitted that no provision of the policy required First State to ask for Mid-Continent's defense, serves as an admission that no duty to request exists.

Further, Defendants argue that the FCAS, Section 627.426, Fla. Stat., does not require an insured to affirmatively request an insurance company to defend in a liability action.  Instead, Defendants contend that Florida law requires an insurer to defend an insured when the underlying

39

complaint alleges facts that fairly and potentially bring the suit within policy coverage as set forth in *Jones v. Florida Ins. Guar. Ass'n, Inc.* ("*FIGA*"), 908 So. 2d 435, 442-43 (Fla. 2005). Defendants also rely on *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000), for the holding that "there is no requirement for an insured to affirmatively request a defense."

Applying Florida law to the facts of the case, Defendants argue that Mid-Continent admitted through its corporate representative Nye that the Southgate State Case complaint alleges an occurrence within the coverage of the Policy. Furthermore, upon receipt of Southgate's State Case lawsuit on January 24, 2008, Mid-Continent had notice of the Southgate State Case, and Mid-Continent's failure to provide a defense breached its fiduciary duties to First State under the Policy and Florida state law. According to Defendant Southgate, "at the very least, there remains a genuine issue of material fact as to whether the receipt of the underlying lawsuit papers by Mid-Continent from Southgate's attorney effectively tendered the matter to the carrier thereby triggering [its] duty to defend the insured." *See* D.E. 175 at 5.

In Florida the duty to defend can exist only by statute or contract. *Allstate Ins. Co. v. RJT Enter., Inc.*, 692 So. 2d 142, 143 (Fla. 1997). Further, "[i]t is well settled that an insurer's duty to defend its insured against legal action arises when the complaint alleges facts that fairly and potentially bring the suit within policy coverage." *FIGA*, 908 So. 2d at 442-43 (citing *State Farm Fire & Cas. Co. v. CTC Dev. Corp.,* 720 So. 2d 1072, 1077 n.3 (Fla. 1998); *Nat'l Union Fire Ins. Co. v. Lenox Liquors, Inc.,* 358 So. 2d 533, 535 (Fla. 1977)); *see also Hartford Accident & Indem. Co. v. Beaver*, 466 F.3d 1289, 1292 (11th Cir. 2006). "The duty to defend must be determined by allegations in the complaint." *FIGA,* 908 So. 2d at 443 (citing *Nat'l Union Fire Ins. Co. v. Lenox Liquors, Inc.,* 358 So. 2d 533, 535 (Fla.1977); *Biltmore Constr. Co. v. Owners Ins. Co.,* 842 So. 2d 947, 949 (Fla. 2d DCA 2003); *McCreary v. Fla. Residential Prop. & Cas. Joint Underwriting Ass'n,*

758 So. 2d 692, 695 (Fla. 4th DCA 1999); *Baron Oil Co. v. Nationwide Mut. Fire Ins. Co.,* 470 So.

2d 810, 813 (Fla. 1st DCA 1985)).  As such, an insurer's duty to defend is based entirely "on the

facts and legal theories alleged in the pleadings and claims against the insured." *James River Ins.*

*Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1275 (11th Cir. 2008).

Indeed, the duty to defend stands regardless of the true facts that gave rise to the cause of

action against the insured, the insured's version of those facts, or the insured's defenses to the

underlying complaint.  *State Farm Fire & Cas. Co. v. Steinberg*, 393 F.3d 1226, 1230 (11th Cir.

2004).  Even if the underlying complaint contains more than one claim, some falling within and

some outside the coverage of the policy, the insurer still must defend the entire suit. *Tropical Park,*

*Inc. v. U.S. Fid. & Guar. Co.*, 357 So. 2d 253 (Fla. 3d DCA 1978); *Trizec Props., Inc. v. Biltmore*

*Const. Co., Inc.*, 767 F.2d 810 (11th Cir. 1985).  As long as the complaint alleges facts that create

potential coverage under the policy, a duty to defend is triggered.  *Trizec Props., Inc.*,767 F.2d at

811.  "[A]n insured is entitled to a defense by its insurer against even the most frivolous suit, so

long as it describes an occurrence within coverage." *Traveler's Indem. Co. of Ill. v. Royal Oak*

*Enters., Inc.*, 344 F. Supp. 2d 1358, 1365 (M.D. Fla. 2004). "Any doubts regarding the duty to

defend must be resolved in favor of the insured."  *FIGA*,  908 So. 2d at 443.

However, "[a] duty to defend does not create coverage where coverage does not exist."

*Colony Ins. Co. v. G & E Tires & Serv., Inc.*, 777 So. 2d 1034, 1038 (Fla. 1st DCA 2000).

Moreover, the duty to defend is distinct from the duty to indemnify. *FIGA*, 908 So. 2d at 443;

*LaFarge Corp.*, 118 F.3d at 1516.  "The duty to defend is of greater breadth than the insurer's duty

to indemnify and the insurer must defend even if the allegations in the complaint are factually

incorrect or meritless." *FIGA*,  908 So. 2d at 443.  Under the circumstances where an insurer is

obligated to defend a claim even if the insurer is uncertain where coverage exists, "[a]n insurer does

not breach its duty to defend an insured when it provides a defense under a reservation of rights." *First Amer. Title Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 695 So. 2d 475, 476-77 (Fla. 3d DCA 1997) (citing *Giffen Roofing Co., Inc. v. DHS Developers, Inc.*, 442 So. 2d 396, 396-76 (Fla. 5th DCA 1983)).  Furthermore, when "an insurer denies a claim and refuses to defend, the insured can take whatever steps as necessary to protect itself from a claim."  *First Amer.*, 695 So. 2d at  477 (citing *Hagen v. Aetna Cas. & Sur. Co.*, 675 So. 2d 963 (Fla. 5th DCA), *review denied*, 683 So. 2d 483 (Fla. 1996)).

Despite the guidance set forth above, this Court has not been able to find a Florida state case that has ruled directly on the issue of whether only a request by an insured can trigger the duty to defend in all circumstances, although the Court recognizes that some federal courts appear to have held as much.  *See, e.g.*, *Pioneer Elec. Co.*, 85 F. Supp. 2d 1337, and *Hartford Accident & Indem. Co.*, 776 F.2d at 1383.[14]   In the absence of a Florida Supreme Court case or Florida appellate decision on point, the Court must "make an educated guess as to what the Florida courts would decide if this case were presented to them."  *Lefrere v. Quezada*, 582 F.3d 1260, 1264 (11th Cir. 2009) (quoting *Benante v. Allstate Ins. Co.*, 477 F.2d 553, 554 (5th Cir. 1973)).[15]

_____

[14]This Court finds inapposite other cases to which Mid-Continent cites for the proposition that a duty to defend is triggered only when the insured requests a defense.  In those cases, the facts differed significantly from those at issue here.  Unlike in the pending matter, in each of the other cases cited by Mid-Continent, the insured was the party arguing that they insurer was under a duty to defend, even though the insured had not requested a defense in accordance with the contractual requirements.  Thus, the courts simply considered whether the insured had complied with the contractual provision requiring it to provide notice to and request a defense from the insurer.  The courts in the other cases cited by Mid-Continent did not have occasion to consider and did not purport to address whether, in all contexts, the only party who can trigger an insurer's duty to defend is an insured.

[15]Decisions of the former Fifth Circuit filed prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*).

While the Florida Supreme Court has not directly ruled on this issue, *dicta* from another Florida Supreme Court decision, *FIGA*, 908 So. 2d at 442-43, guides this Court's finding that under Florida law, where an insured in a case such as this one does not request a defense from its insurer, a duty to defend, nonetheless, can be triggered by a party claiming damages who is intended to be protected against by the insurance policy.[16] In *FIGA*, Gilliam collided with a vehicle operated by Althea Jones, resulting in her death. *FIGA,* 908 So. 2d at 438. Althea's estate, represented by Betty Jones ("Jones"), initiated a wrongful death suit against Gilliam and Althea Jones's insurance carrier. *Id.* at 438-39. As Gilliam's vehicle was connected to an enterprise owned by Michael Pratt ("Pratt"), Jones filed a claim with Pratt's insurer, Dealers Insurance Company. *Id.* at 439. When Dealers became insolvent, pursuant to Florida statute, Florida Insurance Guaranty Association, Inc., or FIGA, stepped into the shoes of Dealers as Pratt's insurance carrier. *Id.*

At a later point, Jones's counsel provided a copy of the complaint against Gilliam to FIGA. *Id.* After Jones amended her complaint to include Pratt and provided a copy of the amended complaint to FIGA, FIGA denied coverage to Pratt and his business on the basis that the claim was not covered under the Florida statute that created FIGA. *Id.* at 439, 452. Due to FIGA's failure to defend Pratt in the underlying wrongful death suit, a default judgment was entered against Pratt. Subsequently, Pratt assigned his rights against FIGA to Jones. *Id.* at 439.

---

[16]Under Section 489.115(1), Fla. Stat., "[n]o person may engage in the business of contracting in [Florida] without first being certified or registered . . . ." Moreover, "[a]s a prerequisite to the initial issuance or the renewal of a certificate or registration, the applicant shall submit an affidavit . . . attesting to the fact that the applicant has obtained . . . property damage insurance for the safety and welfare of the public . . . ." Fla. Stat. § 489.115(5)(a). As the Florida legislature explained, "The Legislature deems it necessary in the interest of the public health, safety, and welfare to regulate the construction injury." Fla. Stat. § 489.101. Thus, it is clear that Florida requires contractors such as First State to procure property damage insurance "for the safety and welfare of the public," not for the safety and welfare of the contractor, although that may certainly be a collateral effect of such a requirement.

43

Then, Jones filed a separate complaint against FIGA seeking payment of the underlying wrongful death suit judgment. The complaint against FIGA, among other counts, alleged that FIGA violated its duty to defend Pratt in the underlying case regarding claims covered by the insurance policy. *Id.* at 439-40. Upon Jones's summary judgment motion, the trial court held that FIGA had wrongfully refused to fulfill its statutory duty to defend the underlying wrongful death case. *Id.* at 441-42. FIGA appealed, and the appellate court reversed the trial court's decision and held that the claims were not cognizable under the FIGA Act. *Id.* at 442.

The Florida Supreme Court reversed the appellate court, holding that based on the facts alleged in the underlying wrongful death complaint, which fairly and potentially brought the action within policy coverage, the wrongful death complaint triggered FIGA's duty to defend Pratt. *Id.* at 438, 443-53.

As part of its analysis in *FIGA* that the insurer had a duty to defend Pratt, the Florida Supreme Court discussed FIGA's contention that the wrongful death action did not constitute a covered claim because Pratt violated the terms of the policy by failing to report the accident, failing to notify FIGA that an action had been field against him, and failing to cooperate in the investigation. *Id.* at 452. Although the Florida Supreme Court deemed these issues waived because FIGA had failed to pursue them in a timely manner below, the court, nonetheless, went on to analyze FIGA's contentions substantively and find them to be without merit. *Id.* at 452.

In so doing, the court concluded that FIGA could not claim prejudice resulting from Pratt's failure to notify FIGA of the accident and of Jones's pending lawsuit because Jones's counsel provided a courtesy copy of the lawsuit to FIGA several weeks after Jones amended the complaint to include Pratt. *Id.* at 452. Further, the Supreme Court noted, FIGA's adjuster who was assigned to the Pratt claim confirmed in deposition testimony that FIGA had in fact received a copy of the

44

amended suit naming Pratt prior to denying Pratt's claim, had had notice of the action, and had had an opportunity to investigate and defend the lawsuit. *Id.* at 452. Regarding FIGA's claims that Pratt had failed to cooperate, the Florida Supreme Court reasoned that because FIGA could not establish that Pratt was aware of the accident or of the ongoing investigation, his failures could not be deemed a breach of his duty to cooperate. *Id.* at 453. Moreover, even if Pratt had failed to cooperate, the Florida Supreme Court explained, FIGA could not demonstrate any prejudice because the insurer had all the information necessary and, nevertheless, unilaterally decided not to defend Pratt. *Id*.

The Court finds *FIGA* instructive, as the *FIGA* opinion as a whole necessarily presupposes that the insurer's duty to defend was triggered, despite Pratt's apparent failure to request a defense.[17] Had the duty to defend not been triggered, the Florida Supreme Court could not have ruled that FIGA was responsible for paying Jones's judgment against Pratt. Under these circumstances and in view of the fact that the *FIGA dicta* focuses on obligations expressly set forth in the policy, the absence of any consideration by the Florida Supreme Court of whether something outside express contractual requirements can trigger an insurer's duty to defend suggests that the triggering of coverage must be determined solely by looking to the terms of the contract.

Moreover, in the matter at hand, Mid-Continent's Rule 30(b)(6), Fed. R. Civ. P., representative effectively testified that Mid-Continent rested its contention that only a request by First State could have triggered Mid-Continent's obligation to defend and indemnify, at least in part

---

[17]Although *FIGA* does not expressly state that Pratt did not request a defense, it does note that Pratt failed to report the accident, failed to notify FIGA that an action had been filed against him, and failed to cooperate in the investigation. It further points out that FIGA only received notice of the suit from Jones's counsel. Under these circumstances, it defies logic to suggest that Pratt requested a defense.

on language in the Policy.  In this respect, when asked whether a provision in the Policy required

First State to request a defense, Nye responded,

> The policy requires that a party who is sued in a lawsuit to immediately or as soon as is practical forward copies of the suit papers and cooperate with our investigation. . . . [B]ased on the cooperation portion of the policy, [the insured has] to submit any legal documents they get and provide any documents we request in support.  They also need to cooperate with the investigation to give us a statement and any other supporting documents that we request. . . . I believe in the duties in the event of an occurrence, it says that an insured must immediately send us copies of any demands, notices, summons or legal papers received in connection with the claim or suit.

D.E. 109-1 at 85-88.

A review of the Policy reveals that the portions to which Nye cited for the requirement to request a defense are the same parts of the Policy upon which Mid-Continent relies in arguing under Count II of the Amended Complaint that First State failed to cooperate, in violation of its duties under the Policy.  *See* D.E. 105-4 at 19.  For this reason, the Court considers Mid-Continent's arguments under Counts I and II of the Amended Complaint together.

Before exploring those contentions, however, the Court pauses to address Mid-Continent's public policy arguments for why an insurer should never have to defend or indemnify where the insured does not request a defense.  In so doing, the Court first notes that with one limited exception, Mid-Continent points to no Florida case law to support its public policy argument.

As for the case law Mid-Continent does cite, it pertains to Section 627.436, Fla. Stat., which is inapposite to this discussion.  Section 627.436(2) limits an insurer's ability to deny coverage to an insured based on a coverage defense.  In the usual situation, an insured requests a defense and indemnity from an insurer.  Upon review of the governing policy, however, an insurer may conclude that a defense to coverage exists under the policy and wish to deny coverage altogether on that

basis.   In that case, among other options, the insurer may retain independent counsel who is mutually agreeable to both the insurer and the insured, and invoke the coverage defense against the insured separately.   *See Allstate Ins. Co. v. M.H.*, 701 F. Supp. 811, 813 (S.D. Fla. 1988).   An insurer can alternatively protect its coverage defenses by doing what Mid-Continent ultimately did: sending its insured a reservation-of-rights letter and subsequently advising the insured in writing of the insurer's refusal to defend the insured because of a coverage defense.   Because Mid-Continent ultimately complied with Section 627.436 in this case by denying coverage, the citation to the mutually agreeable attorney aspect of Section 627.436 has no relevance here.

In addition, as discussed previously, in *FIGA* the Florida Supreme Court concluded that FIGA owed a duty to defend and indemnify Pratt, even though Pratt had failed to report the accident, failed to notify FIGA that an action had been filed against him, and failed to cooperate in the investigation, and FIGA had received its only notification of the lawsuit from Jones's counsel. Obviously, since Pratt was not cooperating, FIGA could not discuss Pratt's desired legal strategy with Pratt.   Nor could FIGA obtain Pratt's informed consent in defending the claim.   And, in order to defend Pratt in these circumstances where Pratt was not cooperating, FIGA would have had to pay a lawyer without Pratt's informed consent.   Nevertheless, the Florida Supreme Court, which is certainly aware of the rules governing the Florida Bar, had no problem finding that FIGA still had to defend and indemnify.

Moreover, under Mid-Continent's proposed view, whenever an insured refused to respond to an insurer's inquiries – even if no substantial prejudice to the insurer resulted from non-cooperation, an insurer would automatically be relieved of its obligation to defend and indemnify because under such circumstances, an insurer would be unable to ascertain the insured's desired legal strategy or the insured's informed consent regarding the insurer's payment of the lawyer.

47

That, however, is not the law.  *See infra* at Sections IV.C.1 & IV.C.3.

Finally, the Court notes that *Pioneer Electric Company*, 85 F. Supp. 2d 1337, demands a different outcome than that discussed above.  Although *Pioneer Electric Company*'s holding does support the conclusion that, in all situations, only a request by an insured can trigger the duty to defend or indemnify, the decision was issued five years prior to the Florida Supreme Court's ruling in *FIGA*.  Thus, the *Pioneer Electric Company* Court did not enjoy the benefit of the *FIGA* decision and *dicta* that this Court must consider.  As this is a diversity case, the Court is bound by Florida precedent and how it believes the Florida Supreme Court may rule in light of its previous decisions.  Although the portion of *FIGA* on which this Court relies is not binding because it constitutes *dicta*, it, nonetheless, provides an indication of the Supreme Court's fairly recent view on an issue that is extremely similar to the one involved in the instant case.  This court cannot ignore that information.  Thus, the Court must look to the Policy to determine whether Mid-Continent had a duty to defend or indemnify.

### 2.  Mid-Continent Has Waived Any Coverage Defenses It May Have Had Under the Policy

Before considering whether, as suggested in Counts I and II of the Amended Complaint, First State's alleged failure to comply with the notice and cooperation provisions of the Policy relieve Mid-Continent of any responsibility to provide a defense or indemnification, the Court first addresses Defendants' contentions that Mid-Continent has waived these defenses.  In particular, Defendants assert both statutory and non-statutory waiver and estoppel affirmative defenses.  Although the non-statutory waiver and estoppel affirmative defenses do not succeed, the statutory waiver and estoppel defense does.

### a.  The Non-Statutory Waiver and Estoppel Affirmative Defenses

With respect to the non-statutory version of these affirmative defenses, Defendants contend that Mid-Continent waived its cooperation defense when Mid-Continent settled Bogosian's claim and that Mid-Continent is estopped from invoking a non-cooperation defense because it paid the Bogosian settlement.  The Court addresses each argument below, but before doing so, notes that neither waiver nor equitable estoppel can be used to expand insurance coverage; rather, the doctrines may only be used to prevent forfeiture of insurance coverage.  *Starlite Servs., Inc. v. Prudential Ins. Co. of Am.*, 418 So. 2d 305, 306-07 (Fla. 5th DCA 1982) (citing *Six L's Packing Co. v. Fla. Farm Bureau Mut. Ins. Co.*, 276 So. 2d 37 (Fla. 1973) (adopting opinion of 4th DCA [268 So. 2d 560] as its own)).

From Defendants' perspective, when Hollander's inspection of Bogosian's claim revealed possible damage by First State to other parts of Southgate, Mid-Continent had notice of other potential claims.  Defendants further note that in December 2006, during Mid-Continent's investigation of Bogosian's claim, Bogosian informed Mid-Continent of the possibility of the filing of other claims.  *See* D.E. 167-1 at ¶ 25; D.E. 167 at ¶ 25.

Moreover, upon the settlement of Bogosian's claim in June 2007, Mid-Continent required Southgate's participation in the settlement process because Southgate was legally responsible for the common areas of the property for which Bogosian received payment. D.E. 108, ¶ 27; D.E. 122-1 at 24-25; D.E. 121-1 at 161-162.  Defendants contend that Mid-Continent paid a portion of the Bogosian claim for the identical type of damage at issue in Defendants' claims.  Significantly, Defendants urge, despite the cessation of First State's cooperation in or around October 2006, Mid-Continent determined damages and settled Bogosian's claim.

In light of these facts, Defendants conclude that Mid-Continent knew of its contractual right

to First State's cooperation, and its voluntary payment to Bogosian constituted an intentional relinquishment and waiver of the cooperation and notice provisions in the Policy. On this basis, Southgate asks the Court to grant its Counter-Claim for declaratory judgment as it regards waiver and enter an order finding that Mid-Continent has waived any defenses it may have had of non-cooperation or other breach of the insurance policy. *See* D.E. 5, ¶¶ 60-62.

Alternatively, Defendants argue in their Counter-Claim that Mid-Continent is estopped from asserting a lack-of-cooperation defense. *See id.* In this regard, Defendants point out that Mid-Continent paid the Bogosian claim after First State's failure to cooperate and after First State allegedly denied to Lewis, Mid-Continent's adjuster, that it was liable for damage.

Mid-Continent counters that no waiver exists because the material facts of Bogosian's claim are not the same as those of Defendants' claims. Unlike Defendants' claims, Bogosian's claim was settled before any lawsuit was filed. Therefore, Mid-Continent reasons, First State did not need to request a defense and, correspondingly, Mid-Continent did not waive its alleged right to have First State request a defense.

Mid-Continent further attempts to distinguish the Bogosian claim facts from those of the Southgate and Basdeo claims by noting that Mid-Continent successfully executed an inspection of Bogosian's unit and his building in order to assess damages, but Mid-Continent did not conduct a full inspection with respect to the other claims. Additionally, at the time of the Bogosian investigation, First State provided some cooperation and information upon which Mid-Continent could partly rely. In contrast, Mid-Continent contends that it could not fully investigate the claims of Defendants because it could not execute an inspection in order to assess damages and First State failed to cooperate. Mid-Continent also asserts that even if Defendants' claims were identical to Bogosian's claims, under Florida law, the settlement of one claim cannot establish that an insured

did not properly settle another matter. As Bogosian's claim was separate and different from Defendants' claims, Mid-Continent concludes that no waiver occurred with regard to the Southgate and Basdeo claims as a result of its settlement of Bogosian's claim.

Mid-Continent similarly argues that estoppel does not apply. More specifically, Mid-Continent represents that it paid the Bogosian claim without knowledge of Defendants' lawsuits against First State and appropriately reserved its right to cooperation regarding the Bogosian claim.

Under Florida law, "'[w]aiver' is 'the intentional relinquishment or abandonment of a known right or privilege, or conduct that warrants an inference of the relinquishment of a known right.'" *Hale v. Dep't of Revenue*, 973 So. 2d 518, 522 (Fla. 1st DCA 2007) (citation omitted). The elements of waiver include the following: "(1) the existence at the time of the waiver of a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge of the right; and (3) the intention to relinquish the right." *Bristol W. Ins. Co. v. Albertson*, ___ So. 3d ___, 2010 WL 2925387, *2, (Fla. 4th DCA July 28, 2010) (citing *Husky Rose, Inc. v. Allstate Ins. Co.*, 19 So. 3d 1085, 1088 (Fla. 4th DCA 2009) (citation omitted)). "Proof of these elements 'may be express, or implied from conduct or acts that lead a party to believe a right has been waived.'" *LeNeve v. Via S. Fla., LLC*, 908 So. 2d 530, 535 (Fla. 4th DCA 2005) (citations omitted).

Nevertheless, in order for a party's representations to constitute a waiver, the waiving party must possess all of the material facts. *L.R. v. Dep't of Children & Families*, 822 So. 2d 527, 530 (Fla. 4th DCA 2002). "The crux of the waiver doctrine rests upon conduct demonstrating an intent to relinquish a known right." *Ferry-Morse Seed Co. v. Hitchcock*, 426 So. 2d 958, 962 (Fla. 1983). Where a party relies upon conduct to imply a waiver, "the conduct relied upon to do so must make out a clear case of waiver." *Costello v. The Curtis Building Partnership*, 864 So. 2d 1241, 1244 (Fla. 5th DCA 2004). The question of waiver constitutes an issue of fact. *WSG W. Palm*

51

*Development, LLC v. Blank*, 990 So. 2d 708, 715 (Fla. 4th DCA 2008) (citing *Hill v. Ray Carter Auto Sales, Inc.*, 745 So. 2d 1136, 1138 (Fla. 1st DCA 1999); *Bolin v. State*, 793 So. 2d 894, 897 (Fla. 2001)).

In this case, although the first element is satisfied, the second and third are not. With respect to the first element, at the time that Mid-Continent entered into the settlement with Bogosian, the Policy provided Mid-Continent with a right to notice and cooperation from First State with regard to any claims by other Southgate unit owners or by Southgate itself. Such a contractual right may be waived.

As to the second element, although Mid-Continent was certainly aware of the Cooperation Provision in its own Policy, the settlement with Bogosian occurred prior to Mid-Continent's receipt of the Southgate and Basdeo State Case lawsuits. And, while prior to the Bogosian settlement, Bogosian had apprised Hollander that as the president of Southgate, he would be "filing claims" against First State, the undisputed facts reflect that as of the time of the Bogosian settlement, neither any unit owners nor Southgate had made claims against First State with Mid-Continent. Under these circumstances, Mid-Continent could not have had even constructive knowledge of all material facts regarding the notice and cooperation provisions as they related to the Southgate and Basdeo State Case lawsuits.

Finally, with respect to the third element, Mid-Continent could not have intentionally waived its right to invoke the cooperation and notice provisions as they related to the Southgate and Basdeo State Case lawsuits where the facts do not establish that it had knowledge of those lawsuits at the time that it entered the Bogosian settlement. For these reasons, I respectfully recommend that the Court **DENY** Southgate's Motion for Summary Judgment on its Counter-Claim as it pertains to non-statutory waiver.

Turning to estoppel, "[e]quitable estoppel is based on principles of fair play and essential justice and arises when one party lulls another party into a disadvantageous legal position." *Fla. Dep't of Health & Rehab. Servs. v. S.A.P.*, 835 So. 2d 1091, 1096 (Fla. 2002). The doctrine "presupposes a legal shortcoming in a party's case that is directly attributable to the opposing party's misconduct . . . [and] bars the wrongdoer from asserting that shortcoming and profiting from his or her own misconduct." *Major League Baseball v. Morsani*, 790 So. 2d 1071, 1077 (Fla. 2001). As the Florida Supreme Court has explained, equitable estoppel "functions as a shield, not a sword . . . ." *Id.*

In the pending case, settling the Bogosian claim did not constitute misconduct or otherwise place Defendants at a disadvantage. Nor have Defendants identified anything about the Bogosian settlement upon which Defendants arguably relied to their disadvantage. Under these circumstances, the doctrine of equitable estoppel simply does not apply. Consequently, I respectfully recommend that the Court **DENY** Southgate's Motion for Summary Judgment on its Counter-Claim as it pertains to non-statutory estoppel.

### b. The Statutory Waiver and Estoppel Arguments

Defendants also argue waiver and estoppel resulting from Mid-Continent's alleged failure to comply with FCAS. In relevant part, FCAS provides,

> (2) A liability insurer shall not be permitted to deny coverage based on a particular coverage defense unless:
>
> (a) Within 30 days after the liability insurer knew or should have known of the coverage defense, written notice of reservation of rights to assert a coverage defense is given to the named insured by registered or certified mail sent to the last known address of the insured or by hand delivery; and

(b)     Within 60 days of compliance with paragraph (a) or receipt of a summons and complaint naming the insured as a defendant, whichever is later, but in no case later than 30 days before trial, the insurer:

1.      Gives written notice to the named insured by registered or certified mail of its refusal to defend the insured;

2.      Obtains from the insured a nonwaiver agreement following full disclosure of the specific facts and policy provisions upon which the coverage defense is asserted and the duties, obligations, and liabilities of the insurer during and following the pendency of the subject litigation; or

3.      Retains independent counsel which is mutually agreeable to the parties. Reasonable fees for the counsel may be agreed upon between the parties or, if no agreement is reached, shall be set by the court.

Fla. Stat. § 627.426.  In Florida, if an insurer fails to comply with this provision of FCAS, it is estopped from denying coverage based on any coverage defenses within the meaning of the statute. *Arnett v. Mid-Continent Cas. Co.*, 2010 WL 2821981, *9-10 (M.D. Fla. Jul. 16, 2010).

"[T]he term 'coverage defense,' as used in section 627.426(2), means a defense to coverage that otherwise exists." *AIU Ins. Co. v. Block Marina Inv., Inc.*, 544 So. 2d 998, 1000 (Fla. 1989). "When the loss falls within the scope of coverage, but the insurer argues that other factors justify not fulfilling the contract, the insurer is asserting coverage defenses." *Mid-Continent Cas. Co. v. King*, 552 F. Supp. 2d 1309, 1316 (N.D. Fla. 2008).  On the other side of the coin, when the insurer argues that coverage is "expressly excluded or otherwise unavailable under the policy or under existing law," the insurer is not raising a coverage defense within the meaning of § 627.426(2).

54

*AIU*, 544 So. 2d at 1000.  An insurer's arguments that an insured has not timely provided proper notice of a claim or that an insured has failed to comply with a cooperation provision constitute coverage defenses.  *See Arnett*, 2010 WL 2821981, *10-11.

Florida courts require strict compliance with Section 627.426(2) unless actual notice to the insured of the insurer's position has occurred on a timely basis.  *See Phoenix Ins. Co. v. McCormick*, 542 So. 2d 1030, 1031-32 (Fla. 2d DCA 1989); *see also Patry v. Capps*, 633 So. 2d 9, 12 (Fla. 1994) (citing *Phoenix*, 542 So. 2d 1030, with approval); *Prime Ins. Syndicate, Inc. v. Soil Tech Distribs., Inc.*, 2006 WL 1823562, *5 (M.D. Fla. Jun. 30, 2006); *Pepper's Steel & Alloys, Inc. v. U.S. Fidelity & Guar. Co.,* 668 F. Supp. 1541 (S.D. Fla. 1987); *Lazzara Oil Co. v. Columbia Cas. Co.*, 683 F. Supp. 777 (M.D. Fla.1988).  As Florida's Second District Court of Appeal has explained, "The statutory language concerning notice by certified mail, registered mail, or hand delivery eliminates problems in proving that the insured received actual notice.  When the insured admits actual notice, however, strict compliance is not required."  *Phoenix Ins. Co.*, 542 So. 2d at 1032.

That, of course, is not the situation in the instant matter, where no evidence exists that First State actually received notice of Mid-Continent's reservation of rights or denial of coverage with regard to the Southgate and Basdeo State Cases.  Nevertheless, under the FCAS, an insurer may also properly deny coverage by letter to the last known address of the insured, even if the insured did not actually receive the notice, provided that the insurer complies strictly with the FCAS.  *See Phoenix*, 542 So. 2d at 1032.

Applying this framework to the instant case, based on the undisputed facts, the Court finds that Mid-Continent is statutorily estopped from invoking its coverage defenses as they pertain to the Basdeo State Case lawsuit, but not as they relate to the Southgate State Case lawsuit.

With regard to Section 627.426(2)(a), although Defendants suggest that Mid-Continent either knew or should have known of its coverage defenses as of October 11, 2006, when Hollander inspected the property and observed damage to parts of Southgate other than Bogosian's unit, this Court disagrees. Nothing in the undisputed facts provides evidence that Mid-Continent knew or should have known that anyone other than Bogosian was actually making a claim under the First State policy. Similarly, although Hollander reported in February 2007 that Bogosian had indicated that as president of Southgate, he would be filing claims on behalf of Southgate, Bogosian never actually took action to file claims on behalf of Southgate. Instead, under the undisputed facts, the first notice that Mid-Continent received that either Southgate or Basdeo would be making claims under First State's Policy occurred on August 3, 2007, when Southgate's counsel rescinded an offer to allow Mid-Continent to inspect Southgate other than as allowed pursuant to the Florida Rules of Civil Procedure.

Upon receipt of the August 3, 2007, notice, on August 8, 2007 – well within the 30-day period allotted by Section 627.426(2)(a), by certified mail addressed to First State's last known address, MCC sent First State a reservation-of-rights letter. *See* D.E. 114, ¶22; D.E. 114-23. Although the record indicates that Mid-Continent had knowledge that First State may have vacated the address to which the letter was sent, no evidence suggests that the address to which Mid-Continent sent the letter was not the last known address for First State. Thus, the timing of the letter and the mode of service of it were in strict compliance with the FCAS.

As for the compliance with Section 627.426(2)(b), the uncontroverted facts establish that on October 3, 2007, Mid-Continent received a copy of the Basdeo State Case complaint and affidavit of service naming First State as a defendant. D.E. 114, ¶ 33; D.E. 114-30. Thus, as of that date, under Section 627.426(2)(b), Mid-Continent had, at most, until December 2, 2007, to (1) serve

written notice by registered or certified mail of Mid-Continent's refusal to defend First State; (2) obtain from Certified a non-waiver agreement; or (3) retain mutually agreeable independent counsel.  The undisputed facts, however, do not indicate that Mid-Continent took any of these actions within the designated period.  Consequently, Mid-Continent failed to comply strictly with the requirements of Section 627.426(2)(b) as it regards the Basdeo State Case claim.  As a result, I respectfully recommend that the Court find that Mid-Continent is statutorily estopped under Section 627.426, Fla. Stat., from invoking its coverage defenses as to the Basdeo State Case claims.

Similarly, with regard to the Southgate State Case, Mid-Continent received a copy of that matter on January 24, 2008.  D.E. 114, ¶ 38.  Therefore, under Section 627.426(2)(b), Mid-Continent had, at most, until March 24, 2008, to (1) serve written notice by registered or certified mail of Mid-Continent's refusal to defend First State; (2) obtain from Certified a non-waiver agreement; or (3) seek to retain mutually agreeable independent counsel.[18]  On February 29, 2008, within the statutory period, by certified mail, Southgate sent First State a letter reserving Mid-Continents rights and asking First State whether First State desired to have Mid-Continent appoint counsel.  *See* D.E. 114, ¶ 40; D.E. 114-35.  This letter did not fulfill the requirements of Section 627.426(2)(b) because it did not provide written notice of Mid-Continent's refusal to defend First State with respect to the Southgate State Case.  Nor does the record contain evidence that Mid-Continent otherwise complied with Section 627.426(2)(b) by March 24, 2008.  Instead, Mid-

---

[18]Mid-Continent suggests that the February 29, 2008, letter was another reservation-of-rights letter.  The Court need not consider whether an insurer can delay the requirements of Section 627.426(2)(b) by sending out additional reservation-of-rights letters concerning the same claims and coverage defenses.  Even assuming, *arguendo*, that an insurer could delay compliance with Section 627.426(2)(b) by sending out such additional reservation-of-rights letters, in this case, Mid-Continent did not send the February 29, 2008, letter within the 30-day period required by Section 627.426(2)(a).  Consequently, the letter does not strictly comply with that provision.

Continent did not send out its letter denying coverage to First State until April 17, 2008.  D.E. 114,

¶ 47.  Because April 17, 2008, falls outside the 60-day period established by Section 627.426(2)(b),

Mid-Continent's efforts under the FCAS do not amount to strict compliance, and Mid-Continent,

therefore, is statutorily estopped from relying on its coverage defenses as they pertain to the

Southgate State Case.  Because Mid-Continent is estopped from espousing its notice and coverage

defenses, I recommend that the Court **DENY** Mid-Continent's Motion for Summary Judgment as

it pertains to Counts I and II.

### 3.  *If Mid-Continent Has Not Waived Its Coverage Defenses, A Genuine Issue of Material Fact Exists with Respect to Whether a Coverage Defense Precludes Recovery*

Should the Court disagree with the analysis set forth above and conclude that FCAS does

not prevent Mid-Continent from asserting its coverage defenses in this matter, summary judgment

on Counts I and II still should not be granted because a genuine issue of material fact exists with

respect to whether the coverage defenses that Mid-Continent invokes preclude recovery.  Under

Count II of the Amended Complaint, Mid-Continent asserts that summary judgment should be

granted in its favor due to First State's alleged failure to cooperate with Mid-Continent in the

investigation and defense of the Southgate and Basdeo State Cases, in violation of the Policy.  As

a result of the lack of cooperation, Mid-Continent complains, Mid-Continent was substantially

prejudiced, and, thus, as a matter of law is relieved of the duty to indemnify or defend.

In support of its position, Mid-Continent argues that First State failed to cooperate by

refusing to respond to Mid-Continent's requests for documents, which the insurer needed to

determine the extent of damage caused by First State as opposed to the damage resulting directly

from Hurricane Wilma.   Mid-Continent contends that it made a good-faith effort to investigate

possible claims by hiring Hollander, and in the beginning, First State responded to Hollander's

inquiries. Subsequently, however, Mid-Continent alleges, First State refused to provide all of the necessary documents in order for Hollander to determine the scope of First State's work, and First State otherwise failed to fulfill its obligation to cooperate.

More specifically, Mid-Continent points to evidence showing that when Southgate fired First State in December 2006, First State did not notify Mid-Continent regarding any potential claims, although the Policy required it to do so. Moreover, Mid-Continent complains that work continued at Southgate after First State left, thereby altering the condition of the site. In addition, Mid-Continent contends that despite First State's failure to respond, once Mid-Continent learned that Southgate might make a claim, Mid-Continent attempted to investigate those claims.

In further support of its position that First State failed to cooperate despite Mid-Continent's good-faith efforts to obtain the company's cooperation, Mid-Continent notes that upon notice on August 3, 2007, that a suit had been filed, Mid-Continent immediately advised First State and asked for relevant copies of the suits, but First State did not respond. Upon notification of default, Mid-Continent asserts that it continued attempts to contact First State by regular and certified mail. When, in February 2008, some of the certified letters to First State came back to Mid-Continent as unclaimed, Mid-Continent hired a private investigator to locate First State, but all attempts failed.

As a result of First State's lack of cooperation, Mid-Continent alleges that it endured substantial prejudice. According to Mid-Continent, First State's failure to cooperate and provide timely notice of the suits prejudiced Mid-Continent's investigation and defense of the claims. Specifically, Mid-Continent argues that without First State's cooperation, it could not appoint to contest service in the state cases, answer the complaint, or determine damages, if any, caused by First State. Nor could Mid-Continent inspect Southgate before additional work was done or interview the insured to determine the facts. Additionally, without First State's cooperation, Mid-

Continent could not determine the defenses to Basdeo's allegations that First State converted her property and negligently failed to secure her appliances.  Mid-Continent asserts that First State's refusal to provide Mid-Continent with documents and to respond to any of Mid-Continent's efforts to contact First State directly violates the Policy.  As a result of First State's non-compliance, Mid-Continent contends, the Basdeo and Southgate State Cases resulted in two default judgments. Under these facts, Mid-Continent claims it suffered prejudice and  as a matter of law should be granted summary judgment.

For their part, Defendants suggest that contrary to Mid-Continent's claims, the facts reveal that First State cooperated with Mid-Continent, Mid-Continent failed to make a good-faith effort to contact First State, and Mid-Continent suffered no prejudice due to First State's failure to provided information to Mid-Continent.  According to Defendants, it is undisputed that First State cooperated with Mid-Continent in its investigation, according to Hollander and Nye's testimony, and provided Mid-Continent with information regarding First State's licensing, First State's use of sub-contractors, First State's reasoning for opening up the roofs, and the status of construction. Defendants also argue that Mid-Continent received the vast majority of the relevant information it needed to investigate the claim from other sources, including information regarding permits, code violations, and the contract.  Finally, Defendants point out that Mid-Continent inspected the property twice.

In support of their contention that Mid-Continent failed to make a good-faith effort to contact First State, Defendants argue that Mid-Continent failed to make any efforts to contact th insured from July 2007 through January 2008.  They further assert that despite the knowledge that First State had closed its business and vacated the address of 5415 N.W. 24th Street, Suite 108, Margate, Florida, Mid-Continent continued to send its letters to this address.  Additionally, Mid-

Continent continued to attempt to contact First State at this vacant address without any confirmation that the letters seeking First State's cooperation had been received by First State.  As for Mid-Continent's hiring of a private investigator, Defendants complain that this activity, too, fails to demonstrate good-faith effort to locate First State, as the investigator informed the insurer in March 2008 that this same address was vacant, but Mid-Continent continued to send letters there, nonetheless.

Defendants contend also that First State's failure to provide notice of the Southgate and Basdeo State Case lawsuits to Mid-Continent is not material to determining whether First State complied with its cooperation obligation.  Defendants read the cooperation provision of the Policy not to require direct communication by First State of suit or notice of a claim, but merely written notice in some way.  As Mid-Continent received courtesy copies of both State Case lawsuits, Defendants reason, the cooperation requirements of the Policy have been fulfilled with respect to written notice of a claim or suit.

Nor can Mid-Continent successfully argue that it suffered substantial prejudice as a result of First State's failure to cooperate, Defendants contend.  As Mid-Continent received notice of the State Case lawsuits prior to the resulting default judgments in both state cases, Defendants suggest that Mid-Continent's own inaction in defending First State caused the defaults, and an insurer should not be able to create and then benefit from prejudice it inflicted upon itself.

Under Florida law, a failure to provide timely notice of loss in contravention of a policy provision provides a legal basis for the denial of recovery under the policy.  *See Ideal Mut. Ins. Co. v. Waldrep*, 400 So. 2d 782, 785 (Fla. 3d DCA 1981) ("Notice is necessary when there has been an occurrence that should lead a reasonably prudent man to believe that a claim for damages would arise.").  Moreover, the failure to give timely notice creates a rebuttable presumption of prejudice

61

to the insurer. "If the insured breaches the notice provision, prejudice to the insurer will be presumed, but may be rebutted by a showing that the insurer has not been prejudiced." *Bankers Ins. Co. v. Macias,* 475 So. 2d 1216 (Fla.1985).  Thus, an insured's violation of a notice requirement does not relieve the insured of its contractual obligation to defend when the insurer shows no prejudice.  *BellSouth Telecomms., Inc. v. Church & Tower of Fla., Inc.*, 930 So. 2d 668, 671 (Fla. 3d DCA 2006) (citing *Aguero v. First Am. Ins. Co.*, 927 So. 2d 894 (Fla. 3d DCA 2005).

The obligations of parties to an insurance policy are a matter of contract, and the parties are bound by the terms of the policy.  *RTC v. Artley,* 24 F.3d 1363, 1367 (11th Cir.1994).  On the other hand, the determinations of whether the notice provision was complied with and what is a reasonable time under the surrounding circumstances constitute questions of fact.  *See Ideal Mut. Ins. Co.,* 400 So. 2d at 785.  As a result, to prevail on a motion for summary judgment on notice grounds, a party must first demonstrate that no material issues of fact exist with respect to each of the following: (1) what the policy required with regard to notice; (2) when notice was provided; (3) whether notice was timely; and (4) whether prejudice exists, either by operation of the unrebutted presumption or otherwise.  *Bray v. Gillespie IX, LLC v. Hartford Fire Ins. Co.*, 2009 WL 1513400, *6 (M.D. Fla. May 27, 2009).

The Court therefore turns to the Policy to determine what it requires.  In relevant part, the Notice and Cooperation Provision provides as follows:

> **Section IV - Commercial General Liability Conditions**
> . . . .
>
> **2.    Duties In the Event of Occurrence, Offense, Claim Or Suit**
>
> **a.**    You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

       (1)      How, when, and where the "occurrence" or offence took place;

       (2)      The names and addresses of any injured persons and witnesses; and

       (3)      The nature and location of any injury or damage arising out of the "occurrence" or offense.

  **b.**      If a claim is made or "suit is brought against any insured, you must:

       (1)      Immediate record the specifics of the claim or "suit" and the date received; and

       (2)      Notify us as soon as practicable.

       You must see to that we receive written notice of the claim or "suit" as soon as practicable.

  **c.**      You and any other involved insured must:

       (1)      Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

       (2)      Authorize us to obtain records and other information;

       (3)      Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

       (4)      Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

D.E. 105-4 at 19.

By its language, the Notice and Cooperation Provision requires the "Named Insured" to notify Mid-Continent of all claims, occurrences, or suits. In particular, it specifies, "*You* must see to it . . . ." The Policy defines "you" as "the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy." D.E. 105-4 at 10.

Section II of the policy sets forth "who is an insured." *See id.* at 17. As relevant here, it provides that First State is an insured. *See id.* An endorsement to the Policy, however, expands coverage to "additional insured – mortgagee, assignee, or receiver." *Id.* at 6. More specifically, the endorsement amends Section II to include as an insured "any mortgagee, assignee or receiver of" "all locations on file with [First State], bound or scheduled on the policy." *Id.* at 6. It further explains that such additional insureds are such "only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership, maintenance, or use of the premises by you . . . ." *Id.*

In other words, First State is a "Named Insured," and so is Southgate, to the extent that a claimant makes a claim against Southgate resulting from First State's potentially covered activity occurring while First State was using or working on the Southgate premises. Based on the contract language, therefore, First State had to provide Mid-Continent with notice, but Southgate could have done so as well or instead with regard to any claims against Southgate, such as Basdeo's State Case. As a matter of undisputed fact, however, First State did not provide Mid-Continent with notice of any lawsuits, and Southgate did not provide Mid-Continent with a copy of the Basdeo State Case. D.E. 114, ¶¶ 25, 26, 32, 33. Under these circumstances, a rebuttable presumption of prejudice to Mid-Continent applies.

Defendants, therefore, must demonstrate that Mid-Continent did not suffer substantial prejudice as a result of First State and Southgate's failure to provide the requisite notice under the Policy. *See Indep. Fire Ins. Co. v. NCNB Nat'l Bank of Fla.*, 517 So. 2d 59, 64 (Fla. 1st DCA 1987) ("It is well established in Florida decisions that, in general, when an insurer is entitled to receive notice as a condition precedent to maintaining an action on a claim, violation of that provision will not operate to defeat coverage absent substantial prejudice to the insurer") (citing *Bankers Ins. Co.*

*v. Macias*, 475 So. 2d 1216 (Fla. 1985); *Nat'l Gypsum Co. v. Travelers Indem. Co.*, 417 So. 2d 254 (Fla. 1982); *Tiedtke v. Fid. & Cas. Co.*, 222 So. 2d 206 (Fla. 1969); *Wolfson v. Ins. Co. of Fla.*, 451 So. 2d 1005 (Fla. 3d DCA 1984)).

A review of the parties' contentions of fact in this case reveals that this issue presents a genuine issue of material fact. On the one hand, Defendants offer evidence that Mid-Continent began its investigation regarding the Southgate and Basdeo claims before any lawsuits were filed, had notice of the lawsuits before judgments of default were entered, and collected all of the necessary information from sources other than First State in order to make a determination on the claim. On the other hand, however, Mid-Continent submits evidence that First State's failure to provide notice impeded its ability to complete the investigation of the claims and truly assess the extent of damage done by First State versus damage resulting from Hurricane Wilma. Mid-Continent further contends that only First State controls some of the information necessary to the determination of the claim. Finally, Mid-Continent offers evidence that after the termination of First State's services, Southgate hired other contractors to repair the work, making the determination of damages caused by First State even more difficult.

Mid-Continent's alleged inability to determine the damages strikes at the heart of what constitutes prejudice, especially in light of the particular nature of the circumstances of this case where the property had already been damaged prior to First State's commencement of its work.

Yet a party cannot create its own prejudice and thereby benefit from it. The evidence that Mid-Continent received courtesy copies of the suits before the default judgments were entered, took pictures and visited the site at the time that it investigated and handled the Bogosian claim, and also had various other sources of information that arguably could have substituted for information not supplied by First State provides strong evidence to possibly rebut Mid-Continent's presumed

prejudice.  As these facts are disputed, the Court cannot make a determination without weighing the facts, an activity not permitted in resolving motions for summary judgment.  Thus, although the Court finds that First State violated the notice provision, as a matter of law, the Court cannot grant summary judgment with regard to whether the notice aspect of this provision of the Policy precludes recovery in this case.

As for the cooperation portion of the Notice and Cooperation Provision, under long-established Florida precedent, an insurer may deny insurance coverage and any payment of damages to the individual damaged by an insured "where the insurer has exercised diligence and good faith in seeking to bring about the cooperation of the insured, and where the insurer has in good faith complied with the terms and conditions of the policy." *Cont'l Cas. Co. v. City of Jacksonville*, 283 Fed. App'x 686, 690-91 (11th Cir. Apr. 22, 2008) (citing *Ramos v. Nw. Mut. Ins. Co.*, 336 So. 2d 71, 75 & n.2 (Fla.1976); *American Fire and Cas. Co. v. Vliet*, 4 So. 2d 862, 863 (Fla. 1941)); *Am. Fire and Cas. Co. v. Collura*, 163 So. 2d 784, 788 (Fla. 2d DCA 1964); *Bordettsky v. Hertz Corp.*, 171 So. 2d 174, 176  (Fla. 2d DCA 1965)).  "A total failure to comply with policy provisions made a prerequisite to suit under the policy may constitute a breach precluding recovery from the insurer as a matter of law." *Haiman v. Federal Ins. Co.*, 798 So. 2d 811, 812 (Fla. 4th DCA 2001) (quoting *Diamonds & Denims, Inc. v. First of Ga. Ins. Co.*, 417 S.E.2d 440, 442 (Ga. Ct. App. 1992)); *see also Aetna Cas. & Sur. Co. v. Mills*, 192 So. 2d 59, 61 (Fla. 3d DCA 1966).

Nevertheless, "[n]ot every failure to cooperate will release the insurance company.  Only that failure which constitutes a material breach and substantially prejudices the rights of the insurer in defense of the cause will release the insurer of its obligation to pay." *Ramos*, 336 So. 2d at 75. Although the question of whether the failure to cooperate is so substantially prejudicial as to release the insurance company from its obligation ordinarily constitutes a question of fact, under some

66

circumstances, particularly where the facts are admitted, it be a question of law.  *Id.* at 75 (citing

*Norwich Union Indemnity Co. v. Willis*, 124 Fla. 137, 168 So. 418 (1936); *Vliet*, 4 So. 2d at 863;

*Collura*,163 So. 2d at 788).  As a result, "[i]f . . . the insured cooperates to some degree or provides

an explanation for its noncompliance, a fact question is presented for resolution by a jury." *Haiman*

*v. Federal Insurance Co.,* 798 So. 2d 811, 812 (Fla. 4th DCA 2001).

        In this case, genuine issues of material fact exist with respect to whether (1) First State

completely violated its duty to cooperate; (2) Mid-Continent in good faith and due diligence

attempted to procure First State's cooperation; and (3) Mid-Continent suffered such prejudice that

it is relieved of any coverage responsibility under the Policy.  More specifically, the record reflects

that First State cooperated to an extent and provided some information to assist Mid-Continent

during the investigation of the Bogosian claim.  *See, e.g.*, D.E. 167-1, ¶¶ 19, 20; D.E. 108, ¶¶ 11,

12, 52.  The evidence of record further shows that some of Mid-Continent's letters attempting to

contact First State were sent to addresses known to be vacant, but also reveals numerous attempts

by Mid-Continent to locate First State, including the hiring of a private investigator.  *See* D.E. 167-

1, ¶ 45; D.E. 114, ¶¶ 40-47.

        With regard to substantial prejudice, Mid-Continent sets forth evidence that First State did

not respond to numerous attempts by Mid-Continent to contact it, seeking cooperation and

information to assist in the investigation of the Southgate and Basdeo claims, and Mid-Continent

submits that it needed additional cooperation by First State in order to investigate and determine

the claims.  *See* D.E. 114, ¶¶ 40-47.  Evidence also shows that Mid-Continent's letters sent by

regular mail to First State in attempts to obtain cooperation  were never returned to Mid-Continent

which may demonstrate that First State received the letters, but chose not to reply.  *See id.*

Additionally, Mid-Continent asserts that to the extent that First State failed to cooperate, Mid-

Continent could not provide an appropriate defense to the suits or claims against First State and that it was not even able to obtain a copy of the Basdeo State Case lawsuit until Basdeo's counsel provided it to Mid-Continent along with the initial default judgment in the case. *See* D.E. 114 at ¶ 33.

Defendants counter Mid-Continent by pointing to evidence suggesting that Mid-Continent's efforts were minimal in trying to locate First State, and that after notice of the suits, Mid-Continent made the decision not to take action, thereby choosing to allow the default judgments to be entered against First State. Additionally, Defendants show that Mid-Continent failed to attempt to communicate with First State over long periods of time. According to Defendants, but for Mid-Continent's failure make a good-faith effort to find First State, First State would not have had default judgments entered against it. Moreover, Defendants note, Mid-Continent was able to obtain information even without First State's assistance. In this regard, Defendants point out that Mid-Continent took pictures and visited the site during the investigation of the Bogosian claim and again in the summer of 2007.

On these facts, the Court cannot find as a matter of law that First State's failure to cooperate was so substantially prejudicial as to completely release Mid-Continent from its obligations under the Policy. I therefore recommend that if the Court finds that FCAS does not preclude Mid-Continent from asserting its coverage defenses, the Motions for Summary Judgment as they relate to Counts I and II of Mid-Continent's Amended Complaint should be **DENIED.**

### 4.  *The Allegations of the Underlying Complaints Assert Damages Falling Potentially Within the Policy and Not Necessarily Excluded Under the Policy*

Before addressing the parties' specific points, the Court first notes some of the principles of interpretation controlling Florida insurance contract law. "Insurance contracts are construed in

accordance with the plain language of the policies as bargained for by the parties, and ambiguities are interpreted liberally in favor of the insured and strictly against the insurer who prepared the policy." *Westmoreland v. Lumbermens Mut. Cas. Co.*, 704 So. 2d 176, 179 (Fla. 4th DCA 1997) (citing *Prudential Prop. & Cas. Ins. Co. v. Swindal*, 622 So. 2d 467 (Fla. 1993)). In this respect, coverage provisions are "construed in the broadest possible manner to effect the greatest extent of coverage." *Id.* (citing *Hudson v. Prudential Prop. & Cas. Ins. Co.*, 450 So. 2d 565, 568 (Fla. 2d DCA 1984)); *Nat'l Merchandise Co. v. United Serv. Auto. Ass'n*, 400 So. 2d 526, 532 (Fla. 1st DCA 1981); *Valdes v. Smalley*, 303 So. 2d 342, 344 (Fla. 3d DCA 1974); *Hartnett v. Southern Ins. Co.*, 181 So. 2d 524, 528 (Fla. 1965)). Consequently, "'when an insurer fails to define a term in a policy, . . . the insurer cannot take the position that there should be a "narrow, restrictive interpretation of the coverage provided."'" *State Farm Fire and Cas. Co. v. CTC Development Corp.*, 720 So. 2d 1072, 1076 (Fla. 1998) (citations omitted). The construction of ambiguities in an insurance policy is a question of law. *State Farm Fire & Cas. Co. v. Metro. Dade County,* 639 So. 2d 63, 65 (Fla. 3d DCA 1994) (citing *Jones v. Utica Mut. Ins. Co.,* 463 So. 2d 1153, 1157 (Fla.1985)).

While "policy provisions which tend to limit liability must construed liberally in favor of the insured against the insurer, . . .where the language of a policy is clear and unambiguous on its face, the policy must be given full effect." *Id.* (citations omitted). Further, "[i]n the absence of ambiguity . . . it is the function of the court to give full effect to the insurance contract as written." *Id.* (citing *U.S. Fire Ins. Co. v. Morejon*, 338 So. 2d 223, 225 (Fla. 3d DCA 1976), *cert. denied*, 345 So. 2d 426 (Fla.1977); *Rigel v. Nat'l Cas. Co.,* 76 So. 2d 285 (Fla.1954)).

With this framework in mind, the Court sets forth the relevant general scope of claims for which the Policy provides protection, subject to certain exclusions discussed as relevant later in this Report and Recommendation:

**Section 1 - Coverage**

**Coverage A - . . . Property Damage Liability**

**1.        Insuring Agreement**

a.      We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies. . . .

b.      This insurance applies to . . . "property damage" only if:

(1)     The . . . "property damage" is caused by an "occurrence". . . .

(2)     The . . . "property damage occurs during the policy period; . . . .

. . .

**13.**     "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

. . .

**17.**     "Property damage" means:

**a.**      Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.**      Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

*See* D.E. 105-4.  A comparison of the State Case complaints with the coverage provisions of the Policy reveals that the State Case allegations fall fairly and potentially within the coverage of the Policy.  In this regard, the Southgate State Case complaint alleges, in relevant part,

5.        . . . First State began performance under the contract [with

70

> Southgate and] failed to perform in good and workmanlike manner, . . . and failed to perform altogether other respects, thereby breaching its duty to perform such services . . . which caused or contributed to the cause of additional structural damage as a result of the damaged property's long-term exposure to the elements.

> 35.     . . . First State . . . . unnecessarily damaged the property of . . . Southgate . . . beyond the actual work inherently involved in the contracted activities.

D.E. 105-2.  Because these allegations claim "property damage" stemming from an "occurrence" or "occurrences" as defined under the Policy that does not certainly fall within a Policy exclusion, *see infra*, the Southgate State Case allegations fairly and potentially are subject to coverage under the Policy.  Indeed, even Mid-Continent's counsel stipulated that Southgate's allegations, in part, allege facts that fairly and potentially bring them within the bounds of the Policy.[19]

The allegations in Basdeo's State Case complaint similarly are subject to potential coverage under the Policy.  In relevant part, Basdeo's State Case complaint alleges,

> 77.     As a direct result of the breach of contract . . [by] First State . . .[Basdeo] . . .incurred significant expenses associated with the loss of use of [her] . . . condominium unit[] . . .as well as those expenses to be incurred associated with additional structural repairs now necessary as a result of additional damage done to [her] condominium[] due to long-term exposure to the elements, and costs associated with replacing personal property taken from [her] . . .home . . . .

> 85.     As a direct result of conversion of the chattels belonging to

---

[19] Mid-Continent refers to *Granada Ins. Co v. Ricks*, 12 So. 3d 276 (Fla. 3d DCA 2009), for the proposition that a corporate representative cannot provide a legal interpretation of a policy.  *Granada*, however, is distinguishable from the facts before the Court.  Here, unlike in *Granada* where a corporate representative purported to stipulate to a legal interpretation of a policy, counsel for Mid-Continent at the time, Kammer, stipulated for the record that a partial "occurrence" under the Policy had been pled in the Southgate State Case.  As Kammer is a licensed Bar member who was acting as Mid-Continent's legal representative in this action at the time that he made the stipulation at issue, Kammer's stipulation binds Mid-Continent.

> [Basdeo] . . . on the part of First State, [Basdeo] . . . .
> suffered a financial loss equal to fair market value of the
> chattels at the time of conversion [by First State].

D.E. 105-3.[20]  Like the Southgate State Case allegations, Basdeo's State Case allegations also set

forth averments that would fairly and potentially invoke coverage under the Policy.

Mid-Continent asserts that the damages for which Southgate seeks coverage are expressly

excluded under Exclusion J of the Policy.  Exclusion J provides, in relevant part,

> **2.      Exclusions**
>
> This insurance does not apply to:
> . . . .
>
> **j.      Damage to Property**
>
> "Property damage" to
> . . . .
> (5)      That particular part of real property on which
> you or any contractors or subcontractors
> working directly or indirectly on your behalf
> are performing operations, if the "property
> damage" arises out of those operations; or
>
> (6)      That particular part of any property that must
> be restored, repaired[,] or replaced because
> "your work" was incorrectly performed on it.
> . . . .
> Paragraph **(6)** of this exclusion does not apply to
> "property damage" included in the "products-
> completed operations hazard."

D.E. 105-4 at 10, 13.  The parties agree that under these sections, work that has not been completed

does not qualify for the exception to the paragraph 6 coverage exclusion, but work that has been

---

[20]Nor does the fact that Basdeo brought the matter as a class action change the analysis. The Court still looks to the four corners of the underlying complaint to see whether it alleges facts that may bring it with coverage of the policy at issue.  *See Hartford Acc. & Indem. Co. v. Beaver*, 466 F.3d 1289, 1293-94 (11th Cir. 2006).

abandoned does.

Mid-Continent contends that all of the damages for which Defendants seek coverage fall under these exclusions. More specifically, Mid-Continent posits that Defendants seek coverage only for damages inflicted as a direct result of First State's performance of work that Southgate contracted it to do. Thus, Mid-Continent reasons, any damages must "arise out of [First State's] operations" or constitute restoration, repair, or replacement necessary because First State incorrectly performed its work.

Moreover, to the extent that Defendants suggest that their damages in the form of property that needs to be repaired or replaced as a result of First State's work on it are excepted from the exclusion set forth in paragraph 6 because they constitute "property damage" that falls under the "products-completed operations hazard," Mid-Continent argues that Defendants have no such qualifying damages. In particular, Mid-Continent notes that Southgate fired First State before First State completed its work. As a result, Mid-Continent concludes, First State neither completed its work nor abandoned the project. Consequently, the "products-completed operations hazard" exception to the paragraph 6 exclusion does not apply.

In response, Defendants first urge the Court to find that the scope of coverage provided for under the Policy constitutes a matter for which Mid-Continent forfeited its ability to contest when it chose not to defend First State in the State Cases. This Court respectfully declines to reach such a conclusion. It is true that a judgment against an indemnitee arising from a suit of which the indemnitor has knowledge and an opportunity to defend is binding on the indemnitor on all essential issues decided. *Hoskins v. Midland Ins. Co.*, 395 So. 2d 1159, 1161 (Fla. 3d DCA 1981). But in this case, the judgments in the State Cases merely find First State liable for negligence with regard to its actions as they relate to Defendants; the State Case judgments do not purport to construe the

73

terms of First State's policy with Mid-Continent or make findings regarding the scope of First State's coverage with Mid-Continent. Indeed, such a judgment would be unusual because the State Case lawsuits did not involve Mid-Continent as a party. As a result, although Mid-Continent may be bound by the state courts' findings of liability on the part of First State, it is not precluded from raising matters falling outside the bounds of the judgments in the State Cases, such as the scope of First State's coverage with Mid-Continent.

Substantively, Defendants allege that their damages stem from property that must be replaced or repaired because of First State's work on it and from collateral damages First State inflicted when it performed work under the contract. Moreover, Defendants disagree with Mid-Continent's position that First State neither completed nor abandoned the Southgate job. They claim that, in fact, First State completed repairs to the flat roofs and abandoned the mansards. Defendant Basdeo further asserts that First State's negligent flat-roof repairs and its opening and subsequent abandoning of the mansards caused her damages. In addition, Basdeo contends that First State was negligent in gutting her unit because she lived on the first floor and had not experienced damage to her unit from Hurricane Wilma, so no reason to gut her unit existed.

The burden of proving coverage falls on the shoulders of the insured, while the burden of demonstrating the applicability of an exclusion to coverage rests with the insurer. *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1516 (11th Cir. 1997) (citation omitted). While "insuring or coverage clauses are construed in the broadest possible manner to effect the greatest extent of coverage," courts interpret any ambiguity in the language of an exclusion strictly against the insurer because exclusionary clauses are generally disfavored. *Westmoreland v. Lumbermens Mut. Cas. Co.*, 704 So. 2d 176, 179 (Fla. 4th DCA 1997)). Nevertheless, where a policy clearly delineates what is excluded, courts must enforce such exclusions. *Id.*

74

Here, despite Mid-Continent's argument to the contrary in support of its Motion for Summary Judgment on Affirmative Defenses, *see* D.E. 111 at 10-12, there can be no genuine dispute that at least a significant portion of Defendants' alleged damages fall within the Policy's definition of "property damage."  While the Court recognizes that the costs for repairing or removing defective work are not covered by the definition of "property damage," the costs of repairing damage *caused by* defective work are.  *See U.S. Fire Ins. Co. v. J.S.U.B.*, 979 So. 2d 871, 889 (Fla. 2007).  Here, Defendants' State Case complaints allege that First State damaged Defendants' property "beyond the actual work inherently involved."  *See* D.E. 114-1 at ¶ 35; *see also* D.E. 1 at 45, ¶ 73; 45-46 at ¶ 77.  Additionally, Hollander's reports support Defendants' position that they experienced damages beyond those associated with having to correct First State's defective work. *See, e.g.*, D.E. 121-1 at 5, 64-66.

Because Defendants seek coverage for damages qualifying as "property damage," the Court considers whether Exclusions j.(5) and j.(6) exclude such coverage.  The burden lies with Mid-Continent to demonstrate the applicability of the exclusions.

Mid-Continent points to several cases that construe Exclusions j.(5) and j.(6).  In *American Equity Insurance Company v. Van Ginhoven*, 788 So. 2d 388 (Fla. 5th DCA 2001), a homeowner hired the insured to make minor repairs to the surface of her swimming pool.  To do this, the insured had to drain the pool.  When the insured drained the pool, the pool popped out of the ground, inflicting damage on the pool, pump, heating system, deck, screen enclosure, landscaping, and sprinkler system.  Based on a policy including the same exclusionary language as Exclusions j.(5) and j.(6) in the Policy in the pending case, the insurer admitted liability for all damage except damage to the pool itself.

The court concluded that the insurer's decision rested on a correct construction of the

exclusions that the insurer invoked.  More specifically, the court reasoned that although the contract called for the insured to make only spot repairs to the surface of her swimming pool, the homeowner understood that in order for the insured to perform these repairs, the insured would have to drain the pool.  Because the insured was draining the pool at the time that the damage occurred, the court explained, the insured was working on the entire pool.  As the exclusions applied to "that particular part of real property on which [the insured was] working directly" and the "'property damage' [arose] out of those operations," the court concluded that the exclusions precluded coverage for damage to the pool.  *See id*. at 390-91.

The court further noted that the exclusion embodied in what is Exclusion j.(6) of the Policy at issue in this case applied because the judgment against the insured in the prior action between the homeowner and the insured found that the insured had negligently drained the pool.  *Id.* at 391. Consequently, the *Van Ginhoven* Court reasoned, the homeowner's damages to the pool occurred because the insured had incorrectly performed its work.  *Id.*

Mid-Continent also relies on a number of cases similar to *Van Ginhoven* in asserting that Exclusions j.(5) and j.(6) relieve Mid-Continent of any obligation to cover Defendants' damages. Defendants do not dispute the meaning of the cases that Mid-Continent cites.

Instead, Defendants rely on the exception to Exclusion j.(6) in support of their argument that the damages they seek are not precluded under the Policy's exclusions.  In this regard, Defendants contend that Exclusion j.(5) is inapplicable and the cases to which Mid-Continent cites, inapposite because unlike in the cases construing the language in Exclusion j.(5), the damages in the instant matter relate to completed or abandoned work, thus making Exclusion j.(6), not Exclusion j.(5), which applies to ongoing work, the applicable one.

In its Reply Mid-Continent does not respond expressly to Defendants' suggestion that

Exclusion j.(5) has no relevance here. *See generally* D.E. 204. Rather, Mid-Continent argues simply that Defendants cannot successfully invoke the exception to Exclusion j.(6) because First State neither completed nor abandoned its work. *See id.* at 2-5. Of course, if the evidence bears out Mid-Continent's view of the facts, either or both Exclusions j.(5) and j.(6) would preclude coverage. In addition, Mid-Continent concedes that the Policy exclusions do not preclude coverage for Defendant Basdeo's personal property. D.E. 204 at 4 n.3.

As it is clear that the applicability of Exclusions j.(5) and j.(6) turns on whether First State completed, abandoned, or was fired while actively still working on the Southgate contract, the Court reviews the facts of record. With respect to the tarping, although Mid-Continent contends that the tarping constituted a portion of a single contract that also included the roofing and other work, Mid-Continent cites no evidence to support this theory. Moreover, the evidence upon which Mid-Continent relies in other portions of its Motions for Summary Judgment demonstrates precisely the opposite. Indeed, the tarping invoice itself reflects that the tarping work was completed on November 1, 2005. *See* D.E. 114-3. Yet Southgate did not enter into the contract with First State to replace the roofs and re-do the interior until November 11, 2005. *See* D.E. 114-2. Nor does the November 11, 2005, contract provide any indication that tarping was a part of it. *See, generally, id.* Thus, any damages stemming from any property that must be repaired or replaced because First State improperly performed its tarping work fall under the exception to Exclusion j.(6) and are covered.

As for the work under the November 11, 2005, contract, while Defendants contend that First State completed its work on the flat roofs, they have cited to no evidence to support this supposition. Mid-Continent, on the other hand, has directed the Court to evidence supporting its position that at the time that Southgate ended its contract with First State, First State had not

completed its work.  D.E. 114, ¶ 35; D.E. 114-31; D.E.119-1 at 32, 38, 77, 78, 80-82.  In fact, Southgate had to hire three other contractors to finish the exterior and interior repairs.  D.E. 114, ¶ 35; D.E.119-1 at 32, 38, 77, 78, 80-82.

Nevertheless, the fact that First State did not complete its work does not necessarily mean that First State did not abandon its work.  Mid-Continent has directed the Court to nothing other than Southgate's attorney's letter firing First State to support its contention that First State did not abandon the job, noting that the letter does not indicate that Southgate was firing First State for abandoning the job.  The letter, however, does not purport to set forth an exhaustive list of reasons why Southgate decided to terminate First State.  Instead, it appears designed to notify First State that Southgate considered First State to have breached the contract and to direct First State to notify its insurance carrier that a claim would be forthcoming.  Furthermore, Defendant Basdeo testified that as of November 2006, the month before Southgate fired First State, Southgate members had not "seen [First State] for months . . . ."  D.E. 166, ¶ 11; D.E. 123-1 at 30-31. This evidence tends to support Defendants' abandonment contention.  Under these circumstances, the Court concludes that a material issue of fact exists with respect to whether First State abandoned its work.  As a result, the Court cannot determine on summary judgment whether the exception to Exclusion j.(6) applies.  Based on the analysis set forth in this Section, therefore, I respectfully recommend that the Court **DENY** Mid-Continent's Motion for Summary Judgment as it seeks summary judgment on its Sixth, Seventh, Fifteenth, and Twentieth Affirmative Defenses.

### *5.  The Fungus, Mildew, and Mold Exclusion*

In Count V of its Complaint and in its Ninth Affirmative Defense to the Counter-Claim, Mid-Continent seeks a finding that any fungus, mildew, or mold damages resulting in any way from First State's actions are excluded from coverage under the Policy.  In response,  Defendant Basdeo

states that she is not seeking damages against First State as a result of fungus, mildew or mold. D.E. 197 at 8; D.E. 165 at 10. Likewise, Defendant Southgate represents that "the damages alleged by Southgate do not include any damage from fungus[,] mildew[,] or mold." D.E. 200 at 10. As both Defendants have stipulated that they do not seek damages for fungus, mildew, or mold under the Policy, I recommend **DENYING AS MOOT** Mid-Continent's Motion for Summary Judgment as it relates to its Ninth Affirmative Defense.

### *6.  The Applicable Policy Limits in this Case May Be As High As $3 Million*

Counts III and IV of Mid-Continent's Amended Complaint and Mid-Continent's Twentieth and Seventeenth Affirmative Defenses to Southgate's Counter-Claim seek, in the case that the Court finds liability against Mid-Continent, to limit Mid-Continent's obligations to $1 million on the theory that only a single occurrence caused damage to Defendants, and the policy limits preclude recovery of more than $1 million. The Court considers each aspect of these defenses in turn.

### a.  Three "Occurrences" Transpired Under the Policy

The Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." D.E. 105-4 at 22. In particular, Mid-Continent contends that all of First State's activities constituted one occurrence because First State had only one contract with Southgate, and it did not complete its work on that contract. Therefore, Mid-Continent reasons, any damages that Southgate experienced as a result of First State's work on the contract would have been suffered due to continuous or repeated exposure to substantially the same general harmful conditions caused by First State's work under the ongoing contract.

In support of its argument, Mid-Continent relies primarily on *Koikos v. Travelers Insurance Company*, 849 So. 2d 263, 269 (Fla. 2003), and *Southern International Corporation v. Poly-*

*Urethane Industries, Inc.*, 353 So. 2d 646, (Fla. 3d DCA 1977) ("*Poly-Urethane*").  The *Koikos* policy employed the same definition of "occurrence" as the Policy in this case, and the *Poly-Urethane* policy's definition was virtually the same.

In *Poly-Urethane* the insured applied a sealing substance to the roofs of each building in a condominium complex.  Several months later, residents began experiencing leaks in the roofs.  The insured did not contest responsibility for the leaks.  The company that contracted with the insured urged the court to find a separate occurrence for each of the buildings involved, but the court concluded instead that only one occurrence had happened, based on analogous case law from other jurisdictions.  *Poly-Urethane*, 353 So. 2d at 648.

Mid-Continent also directs the Court to *Koikos*.  In *Koikos* the insured owned a restaurant where an individual fired "two separate – but nearly concurrent – rounds into the lobby, thereby injuring five individuals.  Two of the victims brought an action against the insured alleging negligent failure to provide security.  In a declaratory judgment, the parties filed cross-motions for summary judgment asking the federal district court to which the case was removed to determine whether the shooting involved one or two occurrences under the policy.  Following the district court's determination that only one occurrence had transpired, the Eleventh Circuit certified the question to the Florida Supreme Court.

The Florida Supreme Court concluded that two "occurrences" had happened.  In reaching its decision, the court applied the "'cause theory,' which looks to the cause of the injuries, rather than the 'effect theory,' which looks to the number of injured plaintiffs.  *Id.* at 269.  As the court explained, however, applying the "cause theory" did not answer the question concerning whether one or two occurrences had transpired because two possible causes could have resulted in the injuries: (1) the insured's failure to provide security and failure to warn, and (2) the intervening

80

intentional acts of the third party in firing gunshots. *Id.*  The Florida Supreme Court concluded that the latter was the cause of injury.

In reaching this decision, the Florida Supreme Court explained,

> It is the act that causes the damage, which is neither expected nor intended from the standpoint of the insured, that constitutes the "occurrence." The insured's alleged negligence is not the "occurrence[;]". . . the insured's alleged negligence is the basis upon which the insured is being sued by the injured party.  Focusing on the immediate cause – that is the act that causes the damage – rather than the underlying tort – that is the insured's negligence – is also consistent with the interpretation of other forms of insurance policies.

*Id.* at 271.  Thus, the Florida Supreme Court reasoned,

> The accident – the event that was neither expected nor intended from [the insured]'s standpoint – was the shooting incident and not [the insured]'s own failure to provide security.  Although [the insured]'s alleged negligence in failing to provide security is the basis for which liability is sought to be imposed, it was the shooting that gave rise to the injuries that were neither expected nor intended from the insured's standpoint.

*Id.*

The Florida Supreme Court then rejected the insurer's suggestion that all of the shots should be treated as a single "occurrence" because of their proximity in space and time.  *Id.*  As deciding the number of occurrences based on the time between shots would "require an arbitrary time interval to distinguish a single occurrence from multiple occurrences," the Florida Supreme Court determined that "using the number of shots fired as the basis for the number of occurrences is appropriate because each individual shooting is distinguishable in time and space."  *Id.* (citation omitted).  The court further explained, "It [the insurer] intended for the multiple shootings to constitute one occurrence, it could have drafted clear policy language to accomplish that result."  *Id.* (citation omitted).

81

In arriving at its conclusion, the Florida Supreme Court distinguished *Poly-Urethane*, describing it as a case where "there was a single force, that once set in motion caused multiple injuries." *Id.* at 270. Expounding on this thought, the court reasoned, "Analogous to this would be if a single shot had injured both [victims]. This was not the case. A shot was fired and [the first victim] was injured. There was a time interval of approximately two minutes before another shot was fired which inflicted most of [the second victim's] injuries." *Id.* Latching onto this explication, Mid-Continent asserts that like the *Poly-Urethane* insured's work on multiple buildings under a single contract, First State's work on all of the buildings under a single contract constituted a single force that once set in motion, caused multiple injuries.

Defendants, on the other hand, direct the Court's attention to the statement in *Koikos* describing each shot as distinguishable in time and space, and, thus, justifying the conclusion that multiple occurrences transpired in that case. Applying this logic to the pending matter, Defendants assert that three separate damage forces, including improper installation of tarps, improper repairs of roofs, and abandonment of the mansards occurred in this case with regard to each of the seven buildings.[21] Thus, Defendants reason, as many as 21 occurrences could have come to pass as a result of First State's actions at Southgate. Because Defendants characterize the definition of "occurrence" in the Policy as ambiguous, however, Defendants submit that three occurrences or 21 occurrences could have happened, depending on how the definition is construed. Defendants further remind the Court that ambiguities in insurance contracts are to be construed in favor of the

---

[21]Defendants originally argued in their Motions for Summary Judgment that, at a minimum, two separate occurrences happened: negligent workmanship on the flat roofs and abandonment of the mansards by First State. D.E. 115 at 22; D.E. 107 at 24. In their Responses to Mid-Continent's Motions for Summary Judgment and in Defendants' Reply in support of their own Motions for Summary Judgment, Defendants asserted a minimum of three occurrences. Mid-Continent did not address this anomaly in its briefs.

insured.

Upon review of the relevant cases, the Court concludes that three occurrences transpired: (1) damages caused in connection with First State's tarping work; (2) damages caused in connection with First State's work on the roofs; and (3) damages caused in connection with First State's work on the mansards.   Each of these categories of damages resulted from a separate force, distinguishable in time and space.

First, contrary to Mid-Continent's suggestion that all of the damages resulted from work under a single contract, as discussed previously, the tarping work was completed apparently without a formal contract and before the roofing and mansards work began.   Indeed, at the time that the tarping work was completed, First State had not yet made any offer and no contract existed with regard to the replacement of the roofs and the re-doing of the interiors.   The contract involved a project entirely separated in time and space from the tarping work.   Moreover, because the tarping work involved only tarping work, it constituted only a single force.

Second, with regard to the mansard and flat-roof work conducted under the November 11, 2005, contract, the number of contracts governing a job does not necessarily determine the number of occurrences.   Indeed, Mid-Continent has identified no cases that hold that the number of contracts is somehow dispositive of the number of occurrences.   Rather, the separate forces inflicting the damages determine the number of occurrences.   Here, the record reflects that work done on the flat roofs differed substantially from work performed on the mansards.   While the mansards were left open, the flat roofs were not.   Moreover, unlike in *Poly-Urethane*, where the insured engaged in the single activity of applying a sealant, in this case, First State undertook different types of work on different parts of the buildings.   Thus, First State's work on each of these parts of the buildings set in motion a separate force distinguishable in space and time.

Consequently, damages stemming from the work on the mansards and the flat roofs constitute two separate occurrences.

Finally, *Poly-Urethane* precludes Defendants' theory that different occurrences transpired at each of the seven separate buildings. Like in *Poly-Urethane*, the contractual work being done on each of the multiple buildings was essentially the same, pursuant to a single contract. In short, the Court finds no basis to distinguish *Poly-Urethane* and therefore concludes that a total of three occurrences transpired in this case.

### b. A $3 Million Policy Limit Applies

Having determined the number of occurrences involved in this matter, the Court now considers the Policy's limits. The Policy sets forth the following relevant limits of insurance:

> General Aggregate Limit (Other Than Products-Completed Operations: $2 million
>
> Designated Construction Project(s) General Aggregate Limit: $2 million
>
> Products-Completed Operations Aggregate Limit: $2 million
>
> Each Occurrence Limit: $1 million

D.E. 105-4 at 3, 38. Under the Policy, a separate $2 million Designated Construction Project(s) General Aggregate Limit applies to all damages caused by "occurrences" that can be attributed only to ongoing operations at a single designated construction project. *See* D.E. 105-4 at 38, ¶ A.1. As relevant in this case, the Designated Construction Project(s) General Aggregate Limit is "the most [Mid-Continent] will pay for the sum of all . . . [covered "property damage"], except damages because of . . . "property damage" included in the "products-completed operations hazard . . . ." *Id.* at ¶ A.2. Nevertheless, such payments do not reduce the General Aggregate Limit. *Id.* at ¶ A.3.

In addition to these limits, the Policy sets forth a limit that provides up to $2 million in coverage for liability arising out of "occurrences" that cannot be attributed only to ongoing

operations at a single designated construction project. *Id.* at ¶ B.  Any payments made for "property damage" stemming from "occurrences" that fall into this category reduce either the General Aggregate Limit or the Products-Completed Operations Aggregate Limit.  *Id.* at ¶ B.1.  Thus, if the applicable damages constitute "products-completed operations hazard" damages, payments under this provision count against the $2 million Products-Completed Operations Aggregate Limit.  If, on the other hand, the damages do not fall into the "products-completed operations hazard" category and are not solely attributable to ongoing operations, they are deducted from the $2 million aggregate limit, which, as noted previously, is a limit separate and apart from the Designated Construction Project(s) General Aggregate Limit.  *See id.* at ¶¶ A.3 & B.2.

Additionally, payments made under the Product(s) Completed Operations Aggregate Limit do not reduce the General Aggregate Limit.  *See id.* at 39, ¶ C.  Under these provisions, if a designated construction project has been "abandoned, delayed, or abandoned and then restarted, or if the authorized contracting parties deviate from the plans, blueprints, designs, specifications or timetables, the project will still be deemed to be the same construction project.  *Id.* at 39, ¶ D. Finally, regardless of the various Aggregate Limits, the Each Occurrence" limit caps coverage for, as relevant in this case, covered "'property damage' arising out of any one 'occurrence.'" *Id.* at 18, Section III, ¶ 5.

Applying these Policy limits to the facts, the Court concludes with respect to the tarping work that coverage is not available under the Designated Construction Project(s) General Aggregate Limit because the tarping work was completed and not ongoing.  Under the Product(s) Completed Operations Aggregate Limit, a $2 million Policy limit is available for any damages incurred under the "products-completed operations hazard" coverage.  Because payments made under the Product(s) Completed Operations Aggregate Limit do not affect the General Aggregate Limit, to

the extent that damages do not fall into the "products-completed operations hazard" category and are otherwise not attributable to ongoing operations, an additional $2 million Policy limit applies to such damages.  In this case, however, the Court has already determined that all of the tarping damages were inflicted as a result of a single "occurrence."  Consequently, although the Policy limits could be as high as $4 million with regard to the tarping, had four or more "occurrences" transpired, the actual Policy limit applicable to the tarping damages in this case is $1 million.

As for any damages stemming from the flat roofs and the mansards, to the extent that coverage exists for such damages, such damages would not be eligible for the Product(s) Completed Operations Aggregate Limit because the work on such projects was not complete.  Moreover, the flat roofs and the mansards categories of damages would each be subject to a $1 million cap because with regard to each such category of damages, only a single "occurrence" caused the covered damages, as previously discussed.  Adding all of the applicable Policy limits together, this Court finds that a $3 million limit applies to any coverage that may be found to exist in this case. For these reasons, I respectfully recommend that the Court **DENY** Plaintiff's Motion for Summary Judgment as it relates to Mid-Continent's Seventeenth and Twentieth Affirmative Defenses.

### V.  Recommendation

For the foregoing reasons, I respectfully make the following **RECOMMENDATIONS**:

1.      Mid-Continent's Motion for Summary Judgment on Counts I and II [D.E. 112] be **DENIED**;

2.      Mid-Continent's Motion for Summary Judgment on Its Affirmative Defenses [D.E. 111] be **DENIED** with respect to its Sixth, Seventh, Fifteenth, Seventeenth, and Twentieth Affirmative Defenses and be **DENIED AS MOOT** with regard to its Ninth Affirmative Defense;

86

3.      Defendant Southgate's Motion for Summary Judgment [D.E. 107] be **GRANTED** as it relates to Counts I and II of Mid-Continent's Amended Complaint, **DENIED** as it relates to Counts III and IV of Mid-Continent's Amended Complaint, and **DENIED AS MOOT** as it relates to Count V of Mid-Continent's Amended Complaint, and be **DENIED** and as it relates to its Counter-Claim and its affirmative defenses set forth in paragraphs 44 and 47 of Southgate's Answer; and

4.      Defendant Basdeo's Motion for Summary Judgment [D.E. 106] be **GRANTED** as it relates to Counts I and II of Mid-Continent's Amended Complaint, **DENIED** as it relates to Counts III and IV of Mid-Continent's Amended Complaint, and **DENIED AS MOOT** as it relates to Count V of Mid-Continent's Amended Complaint.

The parties shall have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Donald L. Graham, United States District Judge. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and shall bar the parties from attacking on appeal the factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v.*

87

*Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982)[22] (en banc); 28 U.S.C. § 636(b)(1).

      **FILED AND SUBMITTED** at Fort Lauderdale, Florida, this 8th day of September 2010.

                                     ROBIN S. ROSENBAUM
                                    United States Magistrate Judge

cc:     Honorable Donald L. Graham
         Counsel of Record

---

[22] Decisions rendered by Unit B of the former Fifth Circuit constitute binding precedent in the Eleventh Circuit. *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).